MEYER GROBART ET AL., PLAINTIFFS-APPELLANTS, v. THE SOCIETY FOR ESTABLISHING USEFUL MANUFACTURES, IN DISSOLUTION, ET AL., DEFENDANTS-RESPONDENTS.

Argued April 11, 1949—Decided April 25, 1949.

138

Mr. *John A. Hartpence* (*Mr. Peter Bentley,* attorney) argued the cause for the appellants.

Mr. *Josiah Stryker* (*Messrs. Stryker, Tams & Horner,* attorneys) argued the cause for the respondents.

The opinion of the court was delivered by

VANDERBILT, C. J.   This is an appeal by the plaintiffs, Meyer Grobart, Samuel Grobart, Rose Rowitz and Yetta Teitelbaum, from a judgment entered on the pleadings in favor of the defendants, The Society for Establishing Useful Manufactures, in dissolution, and its surviving trustees, individually and as such trustees.

The Society was incorporated in 1791 by a special act of the Legislature, *Paterson's Laws* (1800) *p.* 104.   By its charter it was given the right, among other things, to own real estate within the confines of the Town (now the City) of Paterson to a value of $4,000,000 and to hold it free from all local and county taxation.   Over the years the Society acquired extensive holdings of land in Paterson and became as well one of the largest owners of water rights in the Passaic River.   It constructed a dam on the river and also canals which conducted water from the river to lands it owned abutting these canals.   A large portion of the lands owned by the Society were leased to various persons from time to time by perpetually renewable leases, which gave the lessees the right to take from the canals stipulated quantities of water to be used on the abutting land and then returned to the river. The plaintiffs are the lessees in several of these leases under which they were entitled to use certain quantities of water on the lands leased by them for operating mills owned by them.

Due to various factors, foremost of which apparently was the diminished flow of the Passaic River, the Society in the course of time became unable to fulfill its obligations to furnish to plaintiffs' mills the water which would flow through an aperture of $8\frac{1}{2}$ square feet, and consequently in 1925 the then owners of the plaintiffs' mills and the Society entered into an agreement whereby the Society agreed to furnish and the plaintiffs agreed to accept electricity in place of all the water except that which would flow through an aperture of one-half square foot.   This agreement was continued from time to time and was in force in 1946, when the plaintiffs sold

their mills and leasehold estates with the appurtenant water rights to the City of Paterson.

The irrepealable provisions of the charter of the Society exempting the property of the Society from local taxation has for a long time been a source of friction and of litigation between the city and the Society; see *Paterson v. Society, etc.,* 24 *N. J. L.* 385 *(Sup. Ct.* 1854) ; *Society, etc., v. Paterson,* 88 *N. J. L.* 123 *(Sup. Ct.* 1915) ; reversed in part, 89 *N. J. L.* 208 *(E. & A.* 1916) ; *Society, etc., v. Thayer Martin,* 116 *N. J. L.* 257 *(Sup. Ct.* 1936). At all events negotiations were had which culminated in a written offer by the Society to sell and convey its tangible property to the city, subject to all leases, grants, liens and easements (including the water rights of plaintiffs and others) for $450,000. This offer was accepted by the city. Among the terms of the offer was the provision that after the consummation of the sale the Society would be dissolved. The offer was further conditioned on (1) the enactment of valid legislation authorizing the city to acquire the property of the Society subject to easements and servitudes of the nature here involved, and (2) on the approval by the Court of Chancery of the terms of the sale. There were two reasons for insisting on the approval of the sale by the Court of Chancery: (1) all of the stock of the Society was held by the New Jersey General Security Company, which was then in dissolution, and (2) the property of the Society had been variously appraised at values between $400,000 and $1,500,000. In furtherance of the plan legislation was enacted in 1944 authorizing the purchase by municipalities of tax exempt property subject to "leases, mortgages, liens, encumbrances, covenants, easements, servitudes, agreements, liabilities and other claims, which may be settled, adjusted, performed, complied with, or discharged by the municipality." *P. L.* 1944, *cs.* 206 and 207 ; *R. S.* 40 :60–25.7 to 40 :60–25.17, *R. S.* 40 :69–4.1 to 40 :69–4.12.

Following the enactment of this legislation, the trustees in dissolution of the Security Company initiated proceedings in Chancery to obtain instructions with respect to the sale. The plaintiffs here, two of whom owned shares in the Security

Company, as well as other shareholders of the Security Company, filed objections to the sale, the plaintiffs claiming that because of their leases and grants it would be inequitable to approve such sale. The plaintiffs also sued out a writ of *certiorari* attacking the validity of ordinances of the city that had been adopted under the enabling legislation under the claim that the enabling legislation was invalid. While these two proceedings were pending, negotiations were had between the city and the plaintiffs which resulted in an agreement between them whereby the plantiffs agreed to sell to the city all of their interests in the lands owned by the Society as well as all of the water rights appurtenant thereto. The consummation of this agreement, the consideration for which was $350,000.00, was conditioned upon the ultimate acquisition by the city of the property of the Society. Thereupon and in order that the sale by the Society of its property to the city might be effectuated, plaintiffs (1) withdrew their objections to the sale which they had filed in the Chancery proceedings and consented to a decree approving the sale, (2) procured a voluntary dismissal of the *certiorari* proceedings, and (3) so as to induce the other objecting stockholders to withdraw their objections and to consent to a decree approving the sale, agreed to buy the shares of the objecting stockholders and to pay one-half of the fees of counsel of these other stockholders, the Society agreeing to pay the other half.

Thereafter a consent decree to the sale was entered in the Chancery proceedings; the Society conveyed its property to the city under the agreement subject to the leases, easements and other agreements affecting the property, "including the rights existing in others to take water from the canals;" and the plaintiffs conveyed their property and water rights to the city pursuant to the terms of their agreement, receiving therefor the purchase price of $350,000. After the conveyance of its property, the Society dissolved. An order limiting creditors, as prescribed in *R. S.* 14:13–11, was obtained by the trustees in dissolution and, within the time therein limited, the plaintiffs filed their claim for $1,000,000 against the Society for damages allegedly arising out of the depreciation in

value of the property formerly owned by them and conveyed to Paterson, the alleged damages purportedly stemming from the conveyance by the Society to the city of its property which, it was said, left the plaintiffs in a position where they could not enforce their water rights against the city or the property conveyed by the Society to the city. The claim was disallowed, and thereupon the plaintiffs commenced the present action at law.

The amended complaint contains three counts. The first count alleges a claim against the Society and its trustees in dissolution in that the Society, by the sale of its property to the city, disabled itself from supplying water under the leases to the plaintiffs and the plaintiffs' rights under these leases could not be enforced against the city, thereby depreciating the value of their property in the sum of $1,000,000. The second count is a reiteration of all of the charges of the first count with the additional allegation that the directors of the Society conspired to so manage the affairs and business of the Society as to render it unable to perform its obligations and duties to the plaintiffs by virtue of the sale of its property to the city. The third count repeats all of the allegations of the first and second counts and then charges that the enabling legislation was invalid under the Constitution of New Jersey in that it authorized the deprivation of plaintiffs' property without due process. Before filing their answer the defendants demanded copies of the various leases held by the plaintiffs and, after they were served, annexed them to their answer along with a copy of the agreement between the Society and the city. Most of the material factual allegations contained in the amended complaint were admitted by the defendants, except that they alleged that the purpose of the sale of the property of the Society to the city was to extinguish the Society's right to tax exemption. They further alleged in their answer that by virtue of the terms of the agreement with the city the sale was made expressly subject to "all existing liens, if any, easements, leases, grants and agreements affecting the same, including the rights existing in others to take water from the canals of The Society and to have the

dam and raceways of The Society maintained, and a schedule of such easements, leases, grants, agreements and commitments is attached hereto and marked Schedule 'B'." This schedule included the plaintiffs' leases. The defendants also set up as a separate defense that the plaintiffs were estopped by their activities and acquiescence in and consent to the sale to the city, as well as another separate defense alleging that by virtue of the consent decree of the Court of Chancery the question involved in this action became *res judicata*. They further reserved the right to move to strike the amended complaint on the ground that the allegations therein contained did not state a cause of action.

The plaintiffs filed a reply to the answer in which there appears to be no denial of any of the material factual allegations contained in the answer. It does contain, however, allegations in effect setting forth a new cause of action founded upon an alleged conspiracy between the Society, its directors and officers, over the course of many years so to manage the affairs of the Society that it could eventually sell and dispose of the Society's assets in such manner that the plaintiffs and other leaseholders would lose their rights and privileges under the leases but still be rendered unable to recover their damages from the Society and that because of this conspiracy and the diminution in the flow of the waters of the river, the Society "induced and inveigled plaintiffs to accept reduced quantities of water and to accept in place thereof electricity to be furnished by the Society at what appeared temporarily to be a saving and advantage to plaintiffs * * * but which in fact became more and more expensive."

Subsequent to the filing of the reply, the defendants moved to strike the amended complaint, the allegations contained in the reply that set forth the new cause of action, and for judgment on the pleadings. After extensive argument an order was made at the circuit holding, in effect, that the amended complaint did not disclose any valid cause of action, that the reply was insufficient in law, that the amended complaint, answer and reply "when considered together, contained no material issue of fact which if determined in favor of plaintiffs

would lawfully support a judgment for plaintiffs and therefore recommendation is made that judgment on the pleadings be entered in favor of all the defendants on each cause of action stated in the complaint." Accordingly an order for final judgment was entered on September 14, 1948. From that judgment the plaintiffs appeal.

Although the proceedings below were before the effective date of the Judicial Article of the new Constitution, the plaintiffs throughout their briefs and argument invoked the new Rules of Court promulgated under the new Constitution. They contend first that the court below erred in refusing to permit them to amend their amended complaint. In the course of the arguments for judgment on the pleadings the plaintiffs, while insisting strenuously on the adequacy of their pleadings, several times stated that if the court found there were defects in the pleadings they would ask to amend, but as the court pointedly reminded them during the argument they did not propose any specific amendment. Again "at the time of the application for the order for judgment before Judge Davidson on September 14, 1948," to quote the agreed statement in lieu of record, "the plaintiffs orally made an application to be permitted to file an amended complaint, which was refused. The court inquired as to the specific amendment desired, and counsel stated that throughout the case before the court, plaintiffs had urged that in the event of an adverse decision, they might be permitted to file an amended complaint. No draft of amended complaint was submitted, and no further statement was made as to the character or contents of the proposed amendment."

Not only was no amendment to the amended complaint ever presented to the trial court before a decision was announced, but none was ever submitted even orally at the time of the signing of the order for judgment, when the plaintiffs again asked for leave to amend the amended complaint. Nothing was said then or at any other time to enlighten the trial court as to the nature or scope of the desired amendments. Thus there was nothing before the trial court but a belated expression of a desire to file an amended complaint of undefined

character and contents after the court had ruled adversely to the plaintiffs following the hearing of extensive argument and the reading of lengthy briefs on the validity of the plaintiffs' pleadings.

While the new rules contain liberal provisions for the amendment of pleadings before, at and after trial, *Rules* 3:15-1, 3:15-2 and 3:15-3, they also provide for judgment on the pleadings, *Rule* 3:12-3, and for testing the sufficiency in law of pleadings, *Rule* 3:12-2, 3:12-6. A motion for judgment on the pleadings or to strike a pleading for failure to state a claim or defense would be futile if the party whose pleadings are under attack might protect himself by seeking in advance the right to amend them in the untoward event of an adverse decision. An application to amend must be definite and categorical, not vague or unexpressed. Preferably the proposed amendment should be in writing for the convenience of the court and adverse counsel in examining it, but at the least it must be stated at length in open court so as to permit opposing counsel to argue against it, if he so desires, and to give the court a fair opportunity to pass upon its merits intelligently. Neither the trial court nor the opposing party can be forced to buy a pig in a poke in the shape of an undisclosed amendment.

Here the plaintiffs made no request for an opportunity to prepare an amendment in writing or orally. Even when the trial court inquired as to the specific amendment desired nothing was elicited from the plaintiffs beyond a reiteration of the statement made throughout the argument that in the event of an adverse decision they should be permitted to file an amended complaint, of a nature, scope and character entirely undefined or even hinted at. *Sit finis rerum* is one of the oldest maxims known to the common law and it applies with greater force than ever in the busy modern world and as much to pleadings, which are an indispensable preliminary to a trial, as to trials and appeals.

Apart from the general principles here adverted to governing amendments, there are especial considerations inherent in the facts of the case before us which worked against

either stating an amendment or granting it. The plaintiffs were precluded by the order of the Court of Chancery barring creditors of the Society from asserting any claims against the Society other than those presented in the dissolution proceedings. The amended complaint was grounded in the varying forms in its three counts on the matters set forth in the plaintiffs' proof of claim filed in the Chancery proceedings, but its reply, which seems designed to meet the allegations of the answer, sets forth a new cause of action, which we shall presently discuss, that was entirely outside the scope of the allegations of the plaintiffs' proof of claim in Chancery and so barred by the order of the Court of Chancery. There was apparently nothing more that could be said as to the matters set forth in the plaintiffs' proof of claim than was said in the amended complaint; paragraphs 14a to 14k of the reply, which we shall presently discuss, went beyond the proof of claim and so violated the order barring creditors. The trial court's denial of the plaintiffs' motion to amend was therefore entirely proper.

■■ The plaintiffs' second contention is that the amended complaint, "as amplified by the reply," raised questions of fact which could not be disposed of on a motion for judgment on the pleadings. Apart from the new cause of action which was included in paragraphs 14a to 14k of the reply, there would seem to be no disputed question of fact to be passed on by a jury. The cause of action attempted to be pleaded in the reply is neither within the ambit of the original causes of action stated in the amended complaint nor within the claim for damages which was submitted by the plaintiffs to the trustees in dissolution under the order limiting creditors. Our inquiry on plaintiffs' second contention must therefore be as to the plaintiffs' right to employ a reply to "amplify" their complaint. The purpose of a complaint under modern practice is no different than that of a declaration at common law; in each case it is to state a claim for relief, *Rule* 3:8–1. To this the defendant under either system of pleading may respond on the merits in four ways: (1) by an attack on the law implicit in the declaration or complaint by a demurrer

at common law or with us by an appropriate motion to strike, *Rule* 3:12–6; (2) by an attack on the facts alleged in the declaration or complaint in the shape of a denial of them; (3) by setting up new facts in confession and avoidance which while admitting the facts of the first pleading escape their legal effect; and (4) by way of estoppel which neither admits nor denies the allegations of the complaint but advances new matter which, being inconsistent with the complaint, precludes the plaintiff from availing himself thereof, *Gould on Pleading* (*6th ed.*) 97-103. While the names of modern pleadings have changed, among other reasons to indicate that we have outgrown the legal technicalities and absurdities which under the name of special pleading brought disgrace on the common law in the nineteenth century, the essentials of good pleading remain, and necessarily so, because the human mind has not been able to find over the centuries any other methods of dealing on the merits with questions of law and fact, expressed or implicit, in an initial pleading.

Just as an answer is addressed to a complaint, or a plea at common law to a declaration, so is a reply under the rules addressed to the answer, or at common law a replication to the plea. The function of a reply or a replication is to attack the answer or plea, not to set up new causes of action, for that is the purpose of the complaint, nor to "amplify" the complaint, for that is the function of an amendment to the complaint, if one be needed. If a plaintiff may "amplify" a complaint, a defendant should have as much right to respond to it as if it were a complaint. And if a plaintiff may in his reply "amplify" his complaint, why may he not in turn "amplify" his reply in a later pleading and so "amplify" his complaint *ad infinitum?* One has but to state the problem to demonstrate its absurdity. Pleadings, instead of being simplified, would go on indefinitely. An issue of law for the court or of fact for the jury could never be reached; nor would one ever know precisely on what pleadings a trial would be had. Nor is an "amplifying reply," if one may at this date give currency to a dubious phrase, necessary in these days of liberal amendment with a rule providing that amend-

ments relate back to the date of the original pleading and allowing the court to permit the statement of a new or different claim or defense in the pleading, *Rule* 3:15–3. Indeed, with us the function of a reply has been limited to averring new matter to an affirmative defense set forth in an answer. *Rule* 3:7–1, and no pleadings beyond this limited use of a reply are allowed, *idem*.

Here paragraphs 14a to 14k of the reply set up, quite apart from the allegations of the three counts of the amended complaint, that the flow of the Passaic River over half a century had been diminished by diversions to which the Society has consented; that the renewals of the leases that the Society was obligated to renew was a conspiracy; that even the application of the trustees of the dissolved Security Company to the Court of Chancery was a conspiracy. The amended complaint sounds in contract; the reply smacks of tort. One ground of the defendants' motion to strike these paragraphs of the reply was that they constituted a departure from the amended complaint in that they attempted to set up a new cause of action quite unrelated to those alleged in the amended complaint. It is not a mere matter of formal logic that leads the courts to insist that litigants shall not shift their position in *successive* pleadings. Our rules and earlier practice in this State have liberally permitted litigants to plead claims or defenses alternatively or hypothetically in the *same* pleading and to allege inconsistent defenses in the *same* answer, *Rule* 3:8–5, subject, of course, to the provisions of *Rule* 3:11 that in signing the pleading the attorney or litigant vouches that he has read it and that to the best of his knowledge, information and belief there is good ground to support it. But this is a far different matter from permitting a pleader to shift his ground from pleading to pleading. Alternative and hypothetical claims can be attacked in a single answer or motion; inconsistent affirmative defenses may be dealt with in a single reply or motion, but shifting causes of action in successive pleading will completely block the purpose of all pleading, *i. e.,* getting to an issue

or issues where one party asserts the affirmative and the other the negative on a question or questions of law or of fact.

The new matter in the reply not only constitutes a departure, but it also flies in the face of the decree of the Court of Chancery barring creditors of the Society by asserting a cause of action not mentioned in the claim filed by the plaintiffs with the trustees of the Society in dissolution. The new matter set forth in paragraphs 14a to 14k of the reply are not even hinted at in the plaintiffs' proof of claim for $1,000,000. That was based solely on the allegation that the Society sold its property to the city and thereby destroyed the water rights of the plaintiffs. The order limiting creditors followed the mandate of *R. S.* 14:13–11 and 14:13–12 in requiring that "all claims or demands so presented shall be in writing specifying the amount claimed and the particulars of the claim, and shall be verified under oath or the bringing in of the same shall be of no effect." The subsequent order barring creditors applied to all creditors who had not brought in their claims within the time fixed by the order limiting creditors. Thus by the statute and the orders of the Court of Chancery the plaintiffs are permitted to litigate only the matters asserted in their proof of claim. To permit the questioned paragraphs of the reply to stand would be to nullify the orders of the Court of Chancery.

The pleadings in the case at bar are lengthy, but the same principles are applicable to them as to the simplest case. The flexibility and seeming informality of pleadings under the new rules should not deceive one into believing that the essentials of sound pleading at law or in equity have been abandoned. Quite the contrary; the objective of reaching an issue of law or of fact in two or at the most three simple pleadings has been attained, but not at the sacrifice of stating the elements of a claim or of a defense. They remain the same as at common law as a matter of substantive law as well as of good pleading: "The forms of action we have buried, but they still rule us from their graves," *Maitland* (1940), *Forms of Action at Common Law, p. 2,* as a mere glance at our Statute of Limitations or a comparison of the

essentials of any good complaint under the new rules with the elements of the several forms of action as expounded, *e. g.,* in Maitland will demonstrate. The grand objective of the movement for simplified procedure by rules of court is the elimination of the interminable prolixity and absurd technicalities of special pleading, which in the days of Baron Parke, gone never to return, made a mockery of substantive law as well as of substantial justice for the sake of the "record." Said Lord Chief Justice Coleridge in speaking of Baron Parke:

"The right was nothing, the mode of stating everything * * * When it was proposed to give power to amend the statement, 'Good Heavens!' exclaimed the Baron, 'Think of the state of the Record!'— *i. e.,* the sacred parchment which it was proposed to defile by erasures and alterations. * * * And as Baron Parke piped, the Court of Exchequer followed, and dragged after it, with more or less reluctance, the other Common Law Courts of Westminster Hall * * * 'I have aided in building up sixteen volumes of Meeson and Welsby,' said he proudly to Charles Austin, 'and that is a great thing for any man to say!' 'I dare say it is,' said Austin, 'but in the Palace of Truth, Baron, do you think it would have made the slightest difference to mankind or even to England if all the cases in all the volumes of Meeson and Welsby had been decided the other way?' He repeated his boast to Sir William Erle. 'It's a lucky thing,' said Sir William, as he told me himself, 'that there was not a seventeenth volume because if there had been, the common law itself would have disappeared altogether amidst the jeers and hisses of mankind' and, he added, 'Parke didn't seem to like it.' * * * Peace be with him. He was a great lawyer, a man of high character and powerful intellect. No smaller man could have produced such results. If he ever were to revisit the glimpses of the moon, one shudders to think of his disquiet. No *absque hoc*, no *et non*, no colour, expressed or implied given to trespass; no new assignment, belief in the great doctrine of a negative pregnant no longer necessary to legal salvation, and the very nice question, as Baron Parke is reported to have thought, whether you could reply *re injuria* to a plea of deviation in an action on a marine policy not only still unsolved but actually considered not worth solution." Coleridge, L. C. J., in *"The Law in 1847 and The Law in 1889,"* 57 *Contemp. Rev.* 797, 199-801 *(June, 1890).*

The common law has been saved from the excesses of special pleading and especially its verbosity and technicalities, and nowhere more effectively than in New Jersey,

but in the process the substantive law has not been changed. On the contrary, it has been preserved and our procedure has been made to serve the ends of substantial justice, not by abandoning stating the essentials of a cause of action or of a defense, but by doing so in "simple, concise and direct terms," *Rule 3:8–5*(a) ; see, also, *Rules 3:8–1, 3:8–2.*

Considering the pleadings in their entirety, it is quite clear that the only act of the defendants of which the plaintiffs complain is the sale by the Society of its property to the city. But after filing objections to the sale in the Chancery proceedings and *certioraring* the ordinances adopted by the city to put the enabling legislation in effect, the plaintiffs not only withdrew their objections in Chancery to the sale and dismissed the *certiorari* proceedings, but they actively induced the other objecting creditors to withdraw their objections to the sale and to consent to a decree approving the sale to the city. Even more, they agreed to buy their shares of stock and to pay half of their counsl fees. Without the affirmative help of the plaintiffs, the contract for the sale of the Society's property might never have come into existence. In a very real sense they brought about the contract of which they now seek to complain. Having blown cold, and then blown hot, they now seek to blow cold again and this, too, after selling to the city their leases, mills and water rights for $350,000. It is difficult to conceive of a clearer case of estoppel *in pais.* *Sun Dredging, etc., Co. v. Ottens,* 84 *N. J. L.* 740 (*E. & A.* 1913) ; *Fidelity Union Trust Co. v. Chausmer,* 120 *N. J. L.* 208 (*E. & A.* 1938) ; *New Jersey Suburban Water Co. v. Harrison,* 122 *N. J. L.* 189 (*E. & A.* 1939).

The judgment of the former Supreme Court is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, BURLING and ACKERSON—6.

*For reversal*—None.