62 N.J. Super. 522 (1960)
163 A.2d 465
BAND'S REFUSE REMOVAL, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
BOROUGH OF FAIR LAWN, BERGEN COUNTY, NEW JERSEY, A MUNICIPALITY OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS-RESPONDENTS, AND FRANK CAPASSO AND GERALD F. CAPASSO, TRADING, ETC., INTERVENORS-DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 7, 1960.
Decided July 27, 1960.
*527 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Samuel A. Larner argued the cause for intervenors defendants-appellants (Messrs. Budd, Larner & Kent, attorneys).
Mr. Walter H. Jones argued the cause for defendants-respondents (Mr. Morris Dobrin, attorney).
Mr. Heyman Zimel argued the cause for plaintiff-respondent.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendants Capasso appeal from a Law Division judgment declaring void ab initio and setting aside their garbage removal contract with the Borough of Fair Lawn; declaring illegal and void ab initio all payments made to them under the contract; setting aside as illegal and void ab initio Fair Lawn ordinance No 688, a supplement to the borough sanitary code; and awarding $303,052.62 in favor of the borough against them.

I.
In February 1957 the Borough of Fair Lawn advertised for bids on a contract for the collection of garbage, ashes, waste and other refuse in the municipality, pursuant to specifications prepared by the borough manager and approved by the council. Prospective bidders were required to complete under oath a standard form of questionnaire concerning experience, equipment and financial ability, and to file it with the borough manager no later than February 26. The borough reserved the right to refuse a set of the specifications to those not qualifying on the basis of the completed *528 questionnaire. Five contractors filed the qualification form. Of these, four were accepted by the borough manager as qualified to bid. The fifth, Thomas Viola & Son, Inc., was disqualified because it lacked the required number of trucks under the specifications.
The notice to bidders stated that bids were to be received at the regular meeting of the borough council on March 26, 1957. However, the governing body by resolution postponed the time for submitting bids until April 9, its next regular meeting, without readvertisement. The borough manager had recommended the postponement because there was then pending certain legislation regarding dumps which might affect the bids. The qualifying contractors were advised of the postponement prior to March 26. All four submitted sealed bids on April 9. These were opened, read and then referred in regular course to the borough manager for review, report and recommendation. The council members subsequently met on several occasions and reviewed the figures, analyzing costs on the basis of their own inquiry and experience. They also conferred with and sought the advice of the borough manager. Finally, the council on April 23, 1957 unanimously awarded a five-year contract for the collection and disposal of garbage in Fair Lawn to the Capassos, the lowest responsible bidder.
On May 3, 1957 the borough and the Capassos executed a written contract for the five-year period at a base price of $1,095,625. The contract, by reference to paragraph 35 of the specifications, provided that the borough was to pay $1.25 additional compensation monthly for each newly constructed unit occupied after the beginning of the contract period. Additionally, the contractor was to have the exclusive right, under paragraph 31 of the specifications, to collect all garbage, ashes and refuse in the borough and, under paragraph 32, the exclusive right to negotiate private contracts with all business and trade establishments in the borough for such service at a reasonable fee. In case of any dispute regarding the fees to be paid, the matter was *529 to be referred to the borough manager, and his decision as to a fair charge was to be final and binding upon both the contractor and the operator of the establishment.
The Capassos began performance under the contract on May 17, 1957, and continued not only up to the time of the institution of this action, but throughout the period of the protracted trial which followed. Their performance was considered entirely satisfactory by the Fair Lawn officials. The borough made regular payments for the garbage service until the end of the trial. At no time did it rescind the contract or take any steps to do so. After judgment was entered we granted a stay; garbage and refuse collection has continued pending the appeal upon a limited payment basis.
On August 13, 1957 the borough council adopted ordinance No. 688, supplementing the ordinance establishing a sanitary code for Fair Lawn. It provided that no permit could be granted any person for the removal and disposal of garbage, ashes and refuse within the borough unless "pursuant to a contract entered into between such person * * * and the Borough * * * in accordance with the statute in such case made and provided." In other words, it prohibited any person other than the municipal contractor (in this case the Capassos) from collecting garbage, ashes and refuse on either a public or private basis.
Subsequent to the adoption of the ordinance plaintiff Band's Refuse Removal, Inc., applied for a license permitting it to collect garbage, ashes and refuse for the year 1958. The borough manager denied the permit because of the ordinance. Plaintiff then instituted this action.
The many unusual features of the case demand an extended consideration of the pleadings and the record.

II.
On November 25, 1957 plaintiff filed a complaint in lieu of prerogative writs stating that during 1957 it had been *530 and still was engaged in removing and disposing of garbage, ashes and refuse from the Western Electric Co. premises in Fair Lawn under a written contract with the company and pursuant to a permit duly issued by the borough permitting it to engage in the scavenger business. The company had invited plaintiff to bid for its 1958 contract. The complaint alleges that plaintiff, in order to be in a position to bid on that contract, applied to defendant borough and defendant borough manager on October 15, 1957 for a permit, which was refused because of the provisions of ordinance No. 688 adopted August 13 previous. The borough had in the meantime entered into an exclusive contract with the Capassos. Plaintiff claimed that the ordinance, the action of the borough in entering into the Capasso contract, and the borough manager's denial of the permit were arbitrary, discriminatory, unconstitutional and ultra vires. It demanded judgment declaring ordinance No. 688 illegal and void, and ordering the borough, and specifically its manager, to renew its previous permit or issue a new one.
Fair Lawn and its officials filed an answer alleging that the borough had entered into a contract with the Capassos as the lowest responsible bidder after proper competitive bidding under the applicable statutes, which contract designated the Capassos as the sole contractor authorized to collect garbage in the borough. By way of separate defenses it was claimed that: (1) plaintiff's action was barred by reason of the limitation period in R.R. 4:88-15; (2) the ordinance constituted a reasonable exercise of the municipal police power in protecting the health and welfare of the community and its citizens; (3) plaintiff was guilty of laches; (4) plaintiff had no proper standing to prosecute the action because it was not a resident or a taxpayer of Fair Lawn; and (5) the action, if successful, would result in a breach of the Fair Lawn-Capasso contract; plaintiff was equitably estopped from seeking relief, having slept on its rights and permitted the contract to be entered *531 into and the Capassos to begin work and expend money and labor thereunder.
Upon motion duly made and granted the Capassos were permitted to intervene as defendants. They thereupon filed an answer which was identical with the borough's, as well as a counterclaim demanding judgment restraining the borough from issuing any permit to plaintiff during the life of the garbage contract, restraining plaintiff from collecting garbage in Fair Lawn, and adjudging ordinance No. 688 and the contract valid.
A grand jury investigation into scavenger practices and contracts in Bergen County led to a new sequence of pleadings. On May 15, 1958 plaintiff was permitted, over defendants' objection, to file an amended complaint in three counts. The first repeated the allegations of the original complaint. The second was ultimately abandoned and is therefore of no moment here. The third count charged that the Fair Lawn-Capasso contract of a year before was not the result of open and honest competitive bidding, but of "secret agreements and understandings by and among Borough officials, Capasso Bros., and others which tainted the bidding with fraud and rendered the awarding of the contract to Capasso Bros. * * * illegal and void." Plaintiff particularized the alleged fraud by referring to the following actions taken by the Bergen County grand jury since the commencement of suit:
(1) The grand jury had voted indictments against borough council member and former Mayor Sogorko, Mayor Matule, Health Officer Begyn and Borough Manager Williamson, some of whom had been involved in awarding the Capasso contract. It had also filed a presentment setting forth certain improper practices involving borough officials in the award of garbage contracts. The amended complaint notes that the specifications provided for granting an exclusive right to collect garbage from private firms in Fair Lawn and that any dispute as to the rates to be charged was to be settled by the borough manager, and then goes on to allege that garbage collection problems were in practice referred by the borough manager to Health Officer Begyn, so that as a practical matter the rates to be charged for private garbage collection were left to *532 Begyn's determination. It is then alleged that the indictment returned against Begyn charges that he regularly received payments from the Capassos, and was in effect their agent; this gave them a favored position in bidding for the garbage contract since they knew that private garbage collection rates would be set by one who was not an impartial arbitrator.
(2) Immediately before the receipt of bids and the award of the garbage contract, the union representing the employees of garbage collection firms in the area had notified the borough manager and the firms that on and after May 1, 1957 truckdrivers' wages would be increased to $114 a week, with helpers getting $104, and that three men would be required on each garbage truck, instead of two as theretofore. The grand jury had charged that the Capassos were not required to pay the increased salaries until January 1, 1958, or to employ three men on each truck. Plaintiff claimed that the Capassos at the time of making their bid knew the union demands would not be enforced against them and were therefore able to adjust their bid accordingly. The result was that the bidding for the garbage contract was not honest and competitive, but fraudulent.
(3) The indictment returned against Health Officer Begyn and other borough officials charged that they received payments from Capasso Bros., so that the health officer was, at the least, directly or indirectly interested in the garbage contract. Since the statutes, including R.S. 40:83-2, made any such interest illegal, the garbage contract was illegal and void.
Plaintiff accordingly demanded judgment declaring the garbage contract illegal and void, dismissing the Capasso answer and removing the Capassos as parties defendant, and restraining defendants from interfering with plaintiff's garbage collection operations in the borough.
The answer of the borough and its officials to the amended complaint denied the fraud alleged in the third count, maintained there had been compliance with the bidding statutes, and iterated the several affirmative defenses included in their original answer. The Capassos' answer was similar.
The action was pretried on May 13, 1958 by the trial judge who later heard the case. (The amended complaint just mentioned was contemplated at the time of pretrial, obviously followed upon it, and was promptly filed on May 15.) In the light of subsequent developments, it is important *533 to note the contentions and issues crystallized in the pretrial order, and the stipulations and admissions of the parties. Plaintiff contended that ordinance No. 688 was arbitrary, discriminatory and ultra vires because it gave the municipal contractor an exclusive right to collect garbage in the borough. Plaintiff also contended that the Capasso contract was illegal and void because (1) the union letter (mentioned in the third count of the amended complaint) was sent out under an agreement between the business agent of the union, Seratelli, and the Capassos that its provisions would not apply in the event the Capassos were awarded the garbage contract, the purpose of the letter being to affect the bids that would be submitted; and (2) since the borough manager would refer to Health Officer Begyn any dispute as to the price to be charged for private garbage collection, and Begyn was on the Capasso payroll, the Capassos were in a favorable position in submitting bids. All this, it was said, amounted to fraud and collusion. The borough and Capasso Bros. denied the ordinance was arbitrary or ultra vires, but represented a reasonable exercise of the police power; and they also denied the alleged fraud and collusion, or that the contract was illegal. They raised the defenses that plaintiff was barred by the limitations of R.R. 4:88-15; it had no standing to attack the ordinance; and it was barred by laches and equitable estoppel. By their counterclaim the Capassos sought to enforce the ordinance and contract and thereby estop or enjoin plaintiff from collecting garbage and refuse from the Western Electric plant.
We particularly note that the parties, by the pretrial order, agreed that "the bids were advertised and the award was made pursuant to N.J.S.A. 40:50-1 and 40:66-4"; that plaintiff was not a resident or taxpayer of Fair Lawn, or a bidder for the municipal garbage contract; and that plaintiff had been refused a permit and had been collecting garbage without one. The case was set down for trial on June 19, 1958, the trial being estimated to take one day.
*534 It will be seen that plaintiff's action, initially involving simply the validity of the ordinance and the propriety of the borough manager's denial of a garbage permit for collection from a private client, had expanded considerably by the time of the pretrial conference. As already noted plaintiff, more than a year after the award of the contract to the Capassos, and without any valid legal interest therein, amended its complaint to allege the invalidity of the basic contract, advancing as grounds therefor certain hearsay statements (the grand jury actions) of alleged fraud, detailed above. Even as to the expanded claim of fraud plaintiff's counsel frankly conceded the limited nature of the fraud issue in the course of the trial when he said:
"* * * plaintiff's theory of the case at the time the plaintiffs amended, and the pretrial conference was held, was addressed to two questions which plaintiff felt it had a reasonable chance of offering proof on. Number one, the notification from the union to all contractors as to a supposedly contemplated raise in salary. Number 2, the relationship between Begyn and Capasso Brothers as disclosed by the indictment."
Plaintiff was further committed and limited in its factual contention of fraud by its answers to interrogatories submitted just prior to the beginning of the trial: its sole objection respecting secret agreements and the absence of open, honest and fair competitive bidding was that "defendant Capasso would receive favorable treatment"  obviously referring to the alleged relationship between Begyn and the Capassos.

III.
We shall first deal with the issues raised by the pretrial order and properly before the court for determination. The Capassos claim that ordinance No. 688 is valid; that plaintiff may not attack the validity of the contract because it has no standing, it is barred by the provisions of R.R. 4:88-15(a) and by laches; and its case is barren of proof *535 of the fraud alleged in the pretrial order. The trial court held against these contentions.
In support of the validity of the ordinance defendants Capasso rely mainly on Atlantic City v. Abbott, 73 N.J.L. 281 (Sup. Ct. 1906), and Marangi Bros. v. Bd. of Com'rs. of Ridgewood, 33 N.J. Super. 294 (App. Div. 1954). Plaintiff and the borough (which, as we will see, completely changed its position months after pretrial), insist that the ordinance is invalid under the case of McKim v. South Orange, 133 N.J.L. 470 (Sup. Ct. 1945).
In McKim the ordinance provided that no one might collect ashes, garbage or refuse in South Orange without procuring a license from the village board of trustees, and that only one license might be issued and in effect at one time. Fees for scavenger service were to be fixed from time to time by resolution of the board. Such a resolution was adopted, establishing a scale of rates the scavenger might charge property users. By further resolution the trustees licensed a certain corporation to be scavenger for one year at a fee of $1 to be paid to the village. The Supreme Court held the ordinance was not a reasonable exercise of the municipal authority. Quoting from Eckert v. West Orange, 90 N.J.L. 545 (E. & A. 1917), the court noted that there are two methods of municipal disposal of garbage, ashes and refuse: the municipality may do the work itself or it may contract with someone else to do the work. However, if the latter course is chosen and more than $1,000 is to be expended, the municipality must publicly advertise for bids and the contract may only be awarded to the lowest responsible bidder. Relating all this to the South Orange ordinance, the court said:
"* * * The ordinance does not simply limit the privilege of collecting refuse to a single scavenger to be selected by the trustees (Atlantic City v. Abbott, 73 N.J.L. 281). It provides, as we have said, that the work shall be paid for by the householder to the scavenger at a price; such a price as the trustees shall fix. The work has been costing the municipality more than $75,000 per year; and the cost under the proposed method will be but little, *536 if any, less than that. Certainly the aggregate of such moneys to be paid to and received by the scavenger will greatly exceed the sum of $1,000, which is the cost limit for contracting without public bidding, R.S. 40:50-1 incorporated by reference in R.S. 40:66-4, supra. Obviously, the village could not contract directly for the doing of the work without calling for bids. The proposed method is, we think, in violation of a public policy, implicit in these and other statutes, that public work exceeding a limited sum shall not be awarded except upon advertisement and to the lowest responsible bidder. The evils attendant upon an award without open bidding are not less under license than under direct contract. * * *" (133 N.J.L., at pages 473-474)
In Atlantic City v. Abbott, above, and referred to in McKim, the local ordinance prohibited anyone except the duly authorized contractor of Atlantic City from collecting or disposing of garbage or refuse, and contained regulations as to the time, means and manner of collection and disposal. After noting that the disposition of garbage is a matter of prime importance to the public health, justifying careful inspection and regulation on the part of the public authorities, the court concluded that although the ordinance created an exclusive right, it could not be said that this was not the result of an attempt to safeguard the public health by means which were reasonable and which bore a real and substantial relation to the end to be accomplished. It would seem that the Atlantic City case contractor considered the salvage value of the garbage sufficient reward to warrant his assumption of the task of collection without compensation. Therefore, the case did not raise the matter of public policy involved in McKim, i.e., the letting out of public work for a price fixed without competitive bidding.
Marangi dealt with still another type of ordinance, which provided that the board of commissioners should have the right to grant the exclusive privilege of collecting garbage, ashes and refuse upon competitive bidding for a period not exceeding five years. Such privilege could be granted to one whose bid provided for the lowest rates for the removal of such garbage. The Marangis contended, and *537 the trial court agreed, that the ordinance was invalid under the McKim case. In reversing we held that the great weight of authority is to the effect that considerations of public health provide sufficient justification for the granting of an exclusive license to a scavenger to collect garbage within a municipality. See Annotations, 15 A.L.R. 293 (1921), 72 A.L.R. 523 (1931), 135 A.L.R. 1309 (1941); 7 McQuillin, Municipal Corporations (3d ed. 1949), § 24.251, p. 90; 2 Dillon, Municipal Corporations (5th ed. 1911), § 678, p. 1023. We held that the vice which inhered in the McKim ordinance was not present in the case then before us, for the ordinance provided for open competitive bidding after public advertisement of the board of health regulations and the specifications. Moreover, the specifications, attached to and made a part of the license agreement, set out the various classifications of users of the service for which competitive bids for rates to be charged were sought.
The Fair Lawn ordinance differs completely from those just considered. It goes no further than to provide that no permit is to be granted any person for the removal and disposal of garbage, ashes and refuse unless it be pursuant to a contract between such person and the borough "in accordance with the statute in such case made and provided." The reference, obviously, is to the bidding statute, R.S. 40:50-1, calling for open, competitive bidding.
The claim is made that there was no fair and truly competitive bidding for the garbage contract because the bids received were only for household garbage, ashes and refuse, but the successful bidder would have the right to collect from business and industrial establishments at rates to be determined between the scavenger and the establishment  or, in event of disagreement, by the borough manager  a clear evasion of the bidding statutes. Further, it is contended that the bids were improperly received and, more important, that fraud and collusion attended the award of the contract. Whatever may eventually be said *538 in support of the claim that the specifications, bids and contract were illegal, we must look to the ordinance itself, passed some three months after the contract was awarded. It limits the issuance of a permit to one holding a scavenger contract executed in complete keeping with the bidding statute.
That the ordinance may result in an exclusive license is not per se a ground for declaring it invalid, for the granting of such permit, as we have seen in the cases just discussed, is well within the municipal police power. It must be presumed that a municipality, acting under such an ordinance, would do so within the frame of reference of a contract awarded "in accordance with the statute in such case made and provided." Were the scavenger contract properly awarded, whether to the Capassos or anyone else, plaintiff would have no cause to complain. And in a case where such contract was not properly awarded, and that fact legally established, again the ordinance would not be subject to attack: plaintiff would have to establish itself as entitled to a permit because holding a municipal contract awarded in keeping with the bidding statutes or, failing to do so, could not obtain the desired permit.
The trial judge was of the opinion that the public health does not require a single garbage collector. In reaching the conclusion that the ordinance "serves no useful public purpose * * * and was contrary to the public good, and is therefore null and void," he referred to the grand jury presentment that "the exclusive licensing of a single scavenger for the collection of garbage without establishing the amount to be charged for such service provides a fertile area for official misconduct." He also referred to the fact that there were 22 licensed scavengers in Teaneck, another Bergen County municipality, and that "there has never been a breath of scandal and practically no dissatisfaction with the collection of garbage in over thirty years, and no danger to the public health." We find nothing in the record to support these assertions given to justify the *539 trial court's determination that the ordinance was illegal and void.
Plaintiff, by the third count of its amended complaint, claimed that the Capasso contract was illegal and void because of alleged fraud, the particulars of which were spelled out in the pretrial order. At the very beginning of the trial the Capassos moved to dismiss this count because, among other reasons, plaintiff did not have the necessary standing to attack the contract. A similar ground was advanced upon motion for involuntary dismissal at the close of its case and upon motion for judgment made at the end of the entire case. The motions were denied.
It is uncontradicted that plaintiff is not and never has been a resident or taxpayer of Fair Lawn, and was not a bidder or potential bidder for the contract. It therefore was a total stranger to the contract, so that under the pretrial order there was no one before the court with the requisite personal or property interest to attack its validity. Cf. Waszen v. Atlantic City, 1 N.J. 272 (1949), where it was held that an unsuccessful bidder, not a resident or a taxpayer of the municipality, had no standing to attack the award of the contract or the validity of the specifications, whereas another plaintiff, a citizen and taxpayer, did; N.J. State Lodge  Fraternal Order of Police v. Aaron, 39 N.J. Super. 423, 428-429 (App. Div. 1956); 18 McQuillin, Municipal Corporations (3d ed. 1950), § 52.01, p. 2 et seq., and particularly § 52.12, p. 30.
There is the further point that plaintiff is barred from attacking the contract by the limitations contained in R.R. 4:88-15(a). The borough manager denied it a permit on October 25, 1957. Since the original complaint was filed on November 25, 1957, the action was commenced within the 45-day period of the rule. There could therefore be no objection to the first count of the amended complaint, which repeated the original complaint, on the ground that it was barred by limitations.
*540 However, the third count of the amended complaint, which attacked the validity of the contract, was not filed until May 15, 1958, more than a year after the Capasso contract was executed. It introduced a new and different cause of action, and therefore may not be held to relate back to the date the original complaint was filed. Russo v. Wright Aeronautical Corp., 1 N.J. 417, 419-420 (1949); 54 C.J.S. Limitations of Actions § 281, p. 335 (1948).
But even if the amended complaint (third count) be deemed to relate back to the filing of the original complaint, the proceeding seeking review of the validity of the contract was not instituted until more than six months after the alleged accrual of plaintiff's right to attack the contract. Plaintiff's cause of action on the contract, if indeed it had a right to bring any, accrued when the contract was executed, and the limitations period therefore ran from that date. Generally, a cause of action is deemed to accrue when facts exist which authorized one party to maintain an action against another. Marini v. Wanaque, 37 N.J. Super. 32, 38 (App. Div. 1955). The contract was awarded after public advertising and at a public meeting. Plaintiff, a scavenger collecting garbage in Fair Lawn at the time, knew or should have known of the municipal action.
In light of the above, we need not consider the arguments made by the Capassos that plaintiff is barred by laches and that its case was barren of proof of the fraud alleged in the pretrial order.
We conclude, under the issues defined at pretrial, that the Fair Lawn ordinance was valid and that plaintiff had no standing to attack the contract and was also barred by R.R. 4:88-15(a) from questioning its validity.

IV.
The Capassos next contend that the judgment must be reversed because of the manner in which the trial judge *541 conducted the proceedings. On the very first day of the trial, June 19, 1958, counsel for these defendants moved that the judge disqualify himself because his activities before trial demonstrated that he had prejudged the issues and exhibited a plan to use the litigation as a vehicle for a broad municipal investigation. Additionally, counsel during the trial objected repeatedly to the participation in the prosecution of the action by both the trial judge and the amicus curiae whom he had appointed. There were also several motions for mistrial because of the allegedly prejudicial actions of the court. All of these were overruled or denied.
The Capassos charge  and it is conceded by the trial judge and plaintiff's attorney, Mr. Zimel  that the judge communicated with Mr. Zimel before the trial began and discussed with him the production of various witnesses. It is also an admitted fact that when, during the course of a telephone conversation, Mr. Zimel informed the judge of the possibility of discontinuing the third count of the complaint, the judge said that if that were done he would immediately declare the contract void. When this was subsequently revealed in the course of a colloquy shortly to be mentioned, the trial judge sought to justify what he said on the ground that this was his sole means of controlling the case, since a very important issue involving the public welfare would be eliminated. We find the justification without merit. What the trial court said suggests a possible prejudging of the issues before a single word of testimony had been adduced. Indeed, it foreshadows what later became manifest  an attitude on the part of the court that a complete exploration into everything that might possibly touch upon the contract was his personal responsibility.
In discharge of his duty, as he conceived it, the trial judge addressed letters to various counsel demanding the production of certain witnesses and records, thus reflecting a prior partisan analysis and preparation of the case normally *542 considered the exclusive function and legitimate interest of counsel representing the respective parties.
On June 10, 1958 counsel for the Capassos wrote the court requesting an adjournment of the trial because Frank Capasso, one of the parties, was in Europe and would not return for more than a month, and for the further reason that plaintiff had not yet answered the interrogatories authorized under the pretrial order. Although counsel for the other parties consented to the adjournment, the court immediately wrote in reply: "Under no circumstances will there be an adjournment of this case."
Six days before the opening of the trial  on June 13, 1958  the trial judge requested counsel to appear before him. The attorney for the Capassos could not attend because he was engaged in another trial. Nevertheless, the court proceeded to question counsel for plaintiff and the borough, requesting that they produce and subpoena certain named witnesses. As to some of these, plaintiff's attorney said that he had had no intention of calling them. It was during this court appearance that mention was made of the telephone conversation between the trial judge and Mr. Zimel, in the course of which the possibility of discontinuing the third count of the amended complaint was discussed. Mr. Zimel told the court on June 13 that he had amended the complaint because the grand jury had indicted Health Officer Begyn and made a presentment. He frankly admitted, "I have no information other than was contained in the indictment and in the newspapers * * * I have no further proof on that than is contained in the presentment." He went on to explain that the reason he had mentioned dropping the third count when he spoke to the judge on the phone was that "In the recent trial of Mr. Begyn, that part of the indictment which involves him with Capasso Brothers was dismissed by the Court. Since that was dismissed by the Court and there was no ruling on it by any jury or otherwise, I felt that perhaps under those circumstances I might drop the third count and proceed *543 on the illegality of the ordinance itself, feeling now very confident, in my mind anyway, that I would be successful on that point."
After further colloquy, the trial judge proceeded to read a statement obviously prepared in advance for public presentation at the June 13 court session. He reviewed the contents of the pleadings, their filing dates, and the similarity of the positions taken by the borough and the Capassos. He observed that "the fact that the Borough appears unwilling to inquire into the validity of the contract under the present circumstances is most unusual," and then went on to refer to such obviously extra-judicial and legally inadmissible materials as the grand jury investigation, its presentment, and the indictment of two Fair Lawn officials for an offense unrelated to the litigation. "These facts," he said, "together with the newspaper accounts of fraud connected with the collection of garbage under the contract involved in this suit, makes it imperative in the public interest that the matter be investigated * * *." He concluded this part of his statement with the remark that the apparent neglect of the borough to undertake and adequately protect the public interest and welfare involved in the suit "borders on criminal nonfeasance."
The trial judge then proceeded to appoint an amicus curiae, whose duty it would be "to present evidence, subpoena witnesses, examine all witnesses, and submit to the court briefs on the law and facts."
Counsel for the Capassos characterizes the court's statement of June 13 as revealing "a mind ripe for a finding of illegality, fraud, collusion and impropriety." That conclusion is, of course, partisan and strongly stated, but a full reading of the statement readily demonstrates that what the trial judge said was not well advised. His remarks cast a long shadow of a suspicion that the whole case was to be considered in the light of what the grand jury had done and what the newspapers had said; that there was something wrong about the borough and the Capassos taking *544 the same position and filing almost identical pleadings, and that the position of the borough officials bordered on criminal nonfeasance.
With the appointment of an amicus curiae who was to participate fully as an adversary representative of the court in support of the pleaded position of plaintiff, the basis was laid for what in fact became the equivalent of a municipal investigation instead of an impartial trial. A trial judge, no matter how sincerely motivated, may not convert civil litigation into a municipal investigation. The latter is fully provided for under N.J.S. 2A:67A-1.
An investigation into garbage collection practices and contracts may also legitimately be pursued by a grand jury or a legislative committee, as indeed happened in this case. See Senate Resolution 4 of the 1958 Legislature creating a Senate committee "to investigate the subject of garbage collection disposal in the several counties and municipalities of the State"; and Senate Resolution 3 (1959) and Senate Resolution 4 (1960) reconstituting and continuing that committee. The committee held eight hearings in 1959, and two in 1960.
The trial began June 19, 1958 and consumed 21 trial days, as compared with the estimated trial time of one day in the pretrial order. We have already referred to the preliminary motion that the judge disqualify himself under N.J.S. 2A:15-49(c), which provides that no judge shall preside at a trial when he "has given his opinion upon a matter in question in such action." It was denied, as were motions to adjourn the trial because of the absence of defendant Frank Capasso and the failure of plaintiff to answer certain interrogatories, and to dismiss the third count of the amended complaint because barred by R.R. 4:88-15(a) and plaintiff's lack of standing. Objection to participation of amicus curiae in the trial was overruled.
Even a casual reading of the record, covering some 2,000 pages of printed appendix, reveals an extraordinary participation by the judge in the trial of the cause. He obviously *545 had devoted much time in preparing for the questioning of witnesses and the offering of exhibits. This preparation on the part of the court extended to the issuance of subpoenas by the court itself and by its amicus curiae, and the contacting of witnesses for their appearance. The trial judge secured files and documents from the prosecutor's office and sifted them in advance, in preparation of having such of them as he deemed relevant offered as exhibits.
At the hearings the judge called witnesses on his own motion or had the amicus do so, and examined and cross-examined them at length. He offered exhibits he had called for. He ruled upon the propriety of his own questions and upon the admissibility of his own exhibits. On occasion he attacked the credibility of witnesses called by him.
In all, there were 32 witnesses who took the stand during the 21 trial days. Of these, the parties produced five; the trial judge, by his own subpoena, direction or arrangement, called 27. Of the latter, 24 were permitted to testify upon questioning by the court or amicus curiae, and this over the objection of counsel for the Capassos that their names had not been supplied in answer to interrogatories.
The court called Assistant Prosecutors Cuccio and Galda, as well as two shorthand reporters, to testify concerning certain statements which Health Officer Begyn gave the prosecutor's office. Although none of the parties desired to introduce these statements into evidence, believing their admission improper and being unwilling to risk the possibility of a reversal, the court nevertheless through its amicus (although he, too, doubted the propriety of admitting the statements) introduced the statements. The court next called Ridgway, a Bergen County detective, who testified that Frank Capasso told him he had given Begyn a $25 check as a contribution toward a Christmas party, and identified the check.
Borough Manager Williamson was called as a witness by plaintiff. However, the court took over his examination at considerable length. At one point almost 30 pages of the *546 record (roughly about 300 questions and answers) consisted of questioning by the trial judge concerning the Capasso contract. He also asked Williamson to produce certain documents when he returned to the witness stand the next day. Further, he instructed plaintiff's attorney to subpoena the officers of other firms that had bid for scavenger contracts, and their records.
The next witness was Alfred J. Lippman, president of Fereday and Meyer, Inc., one of the unsuccessful bidders, and a witness whom the court had instructed plaintiff to subpoena. Counsel for the opposing parties questioned him for a total of some 19 appendix pages. He was then examined by amicus curiae and the court for some 34 pages as to his computations in preparation for bidding. Another bidder, Stamato, called by plaintiff at the court's request, was questioned by the several counsel for about 13 pages, and by the court and amicus curiae for 17.
The trial judge called as a witness Borough Assessor St. Amour and, together with the amicus, questioned him for 15 pages, as compared with cross-examination by defense counsel covering two pages. Borough Chief of Police Risacher was called as a witness at the judge's suggestion and questioned by him for six pages; counsel for plaintiff asked only three questions. Mayor Vander Plaat was then called to the stand by the court. After two pages of questioning by plaintiff's attorney, the court continued by examining him for 31. Further questioning by amicus curiae and the various counsel consumed 21 pages.
Borough Councilman Shonka was called as a witness by the trial judge and questioned by him and the amicus for 42 pages. The court also called Police Officer Senegeto and, together with the amicus, questioned him about the result of observations he had been instructed to make of the number of trucks and men employed by the Capassos in collecting garbage in Fair Lawn. This examination covers ten pages. The court next called Donald De Bruin, principal clerk-bookkeeper and later the borough clerk and tax collector of *547 Fair Lawn. He was questioned by an attorney who temporarily took the place of amicus curiae, and by the court for 52 pages, while defense counsel examined him for two pages. Another witness called by the court was Ralph Mastrangelo, son of the contractor who held the prior garbage contract in Fair Lawn. The court questioned him for some 50 pages regarding the performance of that contract, with plaintiff's counsel limiting himself to seven pages of examination.
There were other witnesses called and questioned by the court, but the above suffices to demonstrate how active was the judge's participation in the trial. In our opinion, it exceeded the bounds of judicial propriety.
Defendants Capasso do not question the right of a judge to interrogate a witness in order to qualify testimony or elicit additional information, Ridgewood v. Sreel Investment Corp., 28 N.J. 121, 132 (1958), or his right under special circumstances to summon a witness on his own initiative, as in Polulich v. J.G. Schmidt Tool Die & Stamping Co., 46 N.J. Super. 135, 143 et seq. (Cty. Ct. 1957). Generally, a court's interrogation of witnesses, where not excessive, has been sustained. Lawton v. Virginia Stevedoring Co., 50 N.J. Super. 564, 580 (App. Div. 1958), where some of the cases are collected. As was pointed out by our Supreme Court in the Ridgewood case, above, the power to take an active part in the trial of a case must be exercised by the judge with the greatest restraint.
"* * * There is a point at which the judge may cross that fine line that separates advocacy from impartiality. When that occurs there may be substantial prejudice to the rights of one of the litigants. * * *" (28 N.J., at page 132)
The motivation of the trial judge may be found in what he said in his opinion in justification of his appointment of amicus curiae; he felt that the court was "faced with a grave situation testing its ability and will to use its powers, if necessary, to prevent fraud, preserve justice, and *548 protect the public interest." He also observed that he had the power to investigate as auxiliary to his power to decide, and "the power to investigate implies necessarily the power to summon and to question witnesses."
What is called for here is a balancing of judicial power against the interests of a litigant. On the one hand, there is the recognized power of a trial judge to call witnesses. Chalmette Petroleum Corp v. Chalmette Oil Dist. Co., 143 F.2d 826 (5 Cir. 1944); Moore v. Sykes' Estate, 167 Miss. 212, 149 So. 789 (Sup. Ct. 1933); Merchants Bank v. Goodfellow, 44 Utah 349, 140 P. 759 (Sup. Ct. 1914); Dunlap v. Seattle National Bank, 93 Wash. 568, 161 P. 364 (Sup. Ct. 1916); and see the remarks of Justice Frankfurter (dissenting) in Johnson v. United States, 333 U.S. 46, 53-54, 68 S.Ct. 391, 396, 92 L.Ed. 468 (1947). See also, 3 Wigmore on Evidence (3d ed. 1940), § 784, p. 151, and 9 Id., § 2484, p. 267; Comment, "The Trial Judge's Use of His Power to Call Witnesses  An Aid to Adversary Presentation," 51 N.W.L. Rev. 761 (1957).
Balanced against this power of a trial judge must be the necessity of judicial self-restraint and the maintenance of an atmosphere of impartiality. Crowe v. Di Manno, 225 F.2d 652 (1 Cir. 1955); Pariser v. City of New York, 146 F.2d 431 (2 Cir. 1945). Courts must not only be impartial; they must give the appearance of impartiality. Whitaker v. McLean, 73 App. D.C. 259, 118 F.2d 596 (D.C. Cir. 1941).
The power of a trial judge to call and examine witnesses is not unlimited. His conduct of a trial contrary to traditional rules and concepts which have been established for the protection of private rights constitutes a denial of due process. Crowe v. Di Manno, above; American Motorists Ins. Co. v. Napoli, 166 F.2d 24 (5 Cir. 1948); United States v. Marzano, 149 F.2d 923 (2 Cir. 1945); Martin v. Philadelphia Gardens, 348 Pa. 232, 35 A.2d 317 (Sup. Ct. 1944).
*549 The limitations upon the activities and remarks of a trial judge have usually been considered within the frame of reference of a jury trial. However, the necessity of judicial self-restraint is no less important where the judge sits alone; if he participates to an unreasonable degree in the conduct of the trial, even to the point of assuming the role of an advocate, what he does may be just as prejudicial to a defendant's rights as if the case were tried to a jury.
Knapp v. Kinsey, 232 F.2d 458 (6 Cir. 1956), involved a stockholders' derivative suit tried to a judge without a jury. After the trial began the judge wrote the district attorney calling his attention to the fact that the allegations in the complaint indicated a violation by defendants of Securities and Exchange Commission regulations, and forwarded all pleadings, depositions and parts of the transcript to him. He also called counsel into chambers, advising them that he had supervision of the grand jury and that if defendants failed to remedy the situation he might be bound to refer the matter to that body. Further, he appointed an independent auditor to work with plaintiff's counsel, and took an active part in examining and cross-examining witnesses and recommending to him methods of proceeding with the case. The Court of Appeals said:
"* * * In Whitaker v. McLean, 73 App. D.C. 259, 118 F.2d 596, the Court said  `* * * The policy * * * is that the courts of the United States "shall not only be impartial in the controversies submitted to them but shall give assurance that they are impartial"; i.e., shall appear to be impartial. * * * Often some degree of bias develops inevitably during a trial. Judges can not be forbidden to feel sympathy or aversion for one party or the other. Mild expressions of feeling are as hard to avoid as the feeling itself. But a right to be tried by a judge who is reasonably free from bias is a part of the fundamental right to a fair trial.' In Connelly v. United States District Court, 9 Cir. 191 F.2d 692, 697, the Court said  `It is not enough that the judge, despite his predetermination of essential facts, may put them aside and conduct a fair trial but that there also shall be such an atmosphere about the proceeding that the public will have the "assurance" of fairness and impartiality.' In Brown v. Walter, 2 Cir., 62 F.2d 798, 800, the rule was briefly summarized: `Justice does not depend upon *550 legal dialectics so much as upon the atmosphere of the court room, and that in the end depends primarily upon the judge.' * * *
In our opinion, the conduct of the District Judge did not conform to the standard required by the foregoing authorities. Whether unconsciously or otherwise, he failed from the start of the trial to view this case with the impartiality between litigants that the defendants were entitled to receive. His active participation in the case and in the questioning of witnesses exceeded what was reasonably necessary to obtain a clear understanding of what their testimony was and fully justified appellants' complaint that at times `he, figuratively speaking, stepped down from the bench to assume the role of advocate for the plaintiff.' * * *" (232 F.2d, at page 467)
It is our conclusion that the trial judge overstepped the permissible bounds of judicial inquiry in this case. In effect, he took on the role of advocate, his activities extending from investigation and preparation to the actual presentation of testimony and exhibits at the trial. He converted the action into what amounted to a municipal investigation. Cf. Canons of Judicial Ethics, Canon 15, dealing with a judge's interference in the conduct of a trial.

V.
We agree with defendants Capasso that the trial court committed prejudicial error by producing a large number of witnesses and admitting their testimony in evidence.
Defendants Capasso served supplemental interrogatories upon plaintiff on May 20, 1958 requesting the names and addresses of all witnesses to the facts alleged in the third count of the amended complaint. The answer, sworn to about a week before the trial began, read, "Alfonse Begyn, W.T. Williamson, Frank Sogorka, Joseph Matule, all of Fair Lawn, N.J., Frank Capasso, Gerald Capasso, John Ciratelli." This answer was not supplemented or amended before trial.
The court, as noted, produced 27 witnesses on its own motion; 24 had not been named in the answer to interrogatories. *551 Counsel for the Capassos had no advance notice of the identity of these witnesses and no opportunity to conduct adequate pretrial investigation. He made proper objection as each witness was called, but to no avail. The testimony they gave, as a reading of the trial judge's lengthy opinion and supplemental opinion will demonstrate, played an important part in the factual conclusions he reached.
Under R.R. 4:23-12 of our interrogatory rules, the penalty for failure to name a witness in answer to interrogatories is the exclusion of the testimony of that witness at the trial. D'Agostino v. Schaffer, 45 N.J. Super. 395, 400 et seq. (App. Div. 1957), where we reviewed the cases. Although our courts have on occasion relaxed the rule in the "interest of justice," in accordance with the power given by R.R. 1:27A (Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293 (1953); Barber v. Vaccaro, 32 N.J. Super. 573 (App. Div. 1954); Gibilterra v. Rosemawr Homes, 32 N.J. Super. 315 (App. Div. 1954), affirmed 19 N.J. 166 (1955)), such relaxation usually occurs in a case involving a single witness or two where there is an honest misunderstanding or excusable neglect, and an absence of prejudice. The instant action is not such a case.
It would seem anomalous to give a party protection from surprise witnesses when they are called by the opposition, but not when called by the court itself. The potential for harm is identical in either case. In addition, the testimony of the witnesses here called by the court brought entirely new issues into the case which were in no wise comprehended by the pretrial order. These issues found their way into the court's opinions and will be mentioned hereinafter.
The significant part which discovery plays in our modern civil procedure was strongly emphasized in the leading case of Schlossberg v. Jersey City Sewerage Authority, 15 N.J. 360, 371 (1954). Justice Brennan, speaking for a unanimous court, said that the role of our discovery procedure "in the attainment of the just and proper disposition of *552 an action is not less, but if anything more, important than that of the trial itself, and bench and bar share jointly the responsibility to govern the prosecution of the action accordingly." (Italics ours) The trial court steadfastly refused to apply the rules established for the control of our bench and bar when it permitted 24 witnesses to testify over objection. This was an unjustifiable trespass upon the rights of defendants Capasso and amounted to an arbitrary and discriminatory denial to them of the protection of our rules. In short, there was a denial of due process.

VI.
Prejudicial error also resulted from the creation of new issues by the court  issues never mentioned or suggested in the pretrial order.
On September 10, 1958, the eleventh day of the trial and four months after the pretrial conference was held, the trial judge on his own motion, and without prior notice, stated that he was adding new issues, and this over the most strenuous objection of counsel for the Capassos. The new issues were these: (1) that the time for receiving bids was postponed by the governing body in violation of the bidding statute, R.S. 40:50-4 (plaintiff's attorney questioned whether this issue could be raised beyond the time set by the statute and the rules, and borough counsel also indicated that the amendment might not be proper); (2) the contract was void because of alleged failure to comply with the appropriation statute, N.J.S.A. 40:2-29; and (3) if the contract was void ab initio, all payments made thereunder should be set aside and judgment entered in favor of the borough against the Capassos for all such sums.
Following this, defendants borough, borough council and borough manager, now represented by new counsel, announced a complete change of position. They desired to contest the validity of the contract, and this was eventually *553 done by filing an amended pleading. Of this more below. On the last day of the trial, October 21, 1958, substituted counsel moved to amend the pretrial order and answer so as to allege two additional new issues. This was allowed over the Capassos' objection. The two issues were: (1) the prequalification procedure employed by the borough pursuant to R.S. 40:50-5 was not in accordance with the statute, arbitrary, and so designed as to eliminate fair and competitive bidding; and (2) the disqualification of contractor Thomas Viola & Son, Inc. from bidding was improper.
The five added issues provided a substantial foundation for the court's conclusion that the Capasso contract was invalid. Although the trial judge in his original opinion made the bare statement that "There was no justifiable reason to allege surprise on any new issue raised during the trial," we cannot agree. The issues were injected into the case without notice or warning. There was no reason for the Capassos or their counsel to anticipate that these questions were issues to be tried until the judge, against a background of testimony he was largely responsible for adducing, brought them into the trial picture.
As in the case of the judge's other activities before and during trial, so here  he apparently considered it his duty to introduce new issues because of the public character of the case, in disregard of those which had been defined by the parties, and in disregard of the rules and precedents applicable in civil cases.
The function of a trial judge is to serve litigants by determining their disputes and the issues implicated therein in accordance with applicable rules and law. Established procedures lie at the heart of due process and are as important to the attainment of ultimate justice as the factual merits of a cause. A judge may not initiate or inspire litigation and, by the same token, he may not expand a case before him by adding new issues which come to mind during the trial, without giving the parties affected a full and fair opportunity to meet those issues.
*554 A municipal governing body may, where so authorized, conduct an investigation into the affairs of a municipality or its officials. N.J.S. 2A:67A-1 et seq. And the Legislature has made adequate provision for a court-supervised summary investigation at the instance of taxpayers or the governing body. N.J.S.A. 40:6-1 et seq. In the latter case, the court or its appointed expert is not limited by pleadings or a pretrial order. However, such a municipal investigation is only a fact-finding process and does not lead to a judicial judgment affecting property rights. In re Tiene, 13 N.J. 478 (1953); 19 N.J. 149 (1955). The broad inquiry permissible in an investigation is not appropriate to a civil trial between parties who come before the court for the decision of a specific dispute upon issues they have deliberately defined.
In Schlossberg v. Jersey City Sewerage Authority, above, Justice Brennan had occasion to discuss the role which our discovery and pretrial practice plays in our present civil procedure, and also pointed up the distinction between a municipal investigation and a prerogative writ proceeding involving a public body. Dealing with the pretrial order as limiting the issues which may be tried, he said:
"Our rules of court provide a simple and flexible procedural framework designed and purposed for the just and expeditious determination in a single action of the ultimate merits of an entire controversy between litigants. Each litigant has broad latitude to assert any ground of relief or defense supporting his position and is provided with broad discovery and pretrial procedures by which he may obtain all the facts material to the positions of both sides and is allowed great freedom to form and reform his pleadings and the pretrial order accordingly. Ajamian v. Schlanger, 14 N.J. 483 (1954). However, the flexibility and liberality allowed by our procedural system to enable the litigants before actually going to trial to identify and agree upon the issues really in controversy between them are not to be twisted into license to roam at will at the trial outside the agreed upon issues framed in that manner and reduced to expression in the pretrial order. Litigants may move about with greatest freedom during the pleading, discovery and pretrial stages of the action, but after the framework of the case has been settled under the pleadings and the pretrial order, the introduction of additional issues or a shift of ground from those *555 agreed upon may be made over timely and meritorious objection only as permitted by R.R. 4:29-1(b) (15) and 4:15-2 applicable to amendments offered after entry of the pretrial order, or during trial." (15 N.J., at pages 369-370)
Further on in the opinion Justice Brennan stressed that "To permit the trial itself to take on the aspects of a discovery proceeding is manifestly destructive of the aims of our procedural framework." (at page 374)
What was said of litigants in Schlossberg logically applies, with at least equal force, to the trial judge.
Turning to the distinction which exists between a case like this and a municipal investigation, Justice Brennan said:
"While a prerogative writ proceeding is ordinarily concerned with the public business, it must be remembered that it nevertheless remains a civil action between named parties in which definite issues framed by the pleadings and pretrial order are tried and determined. State v. Donovan, supra [129 N.J.L. 478 (Sup. Ct. 1943)]. The proceeding is in no sense a probe comparable to a grand jury inquiry. In re Pillo, supra [11 N.J. 8 (1952)], or an investigation into the conduct of municipal affairs, such as is now being made in Jersey City, Tiene v. Jersey City, 13 N.J. 478 (1953), where there are no pleadings or pretrial order to define the issues of relevancy or materiality. 8 Wigmore, supra [8 Wigmore on Evidence (3d ed. 1940), § 2210)], p. 151. * * *" (15 N.J., at pages 374-375)
It is basic that amendments to the pleadings and pretrial order may only be allowed where such amendments are not unfair to the opposing party. Roberts Electric, Inc. v. Foundations, etc., Inc., 8 N.J. Super. 168, 171 (App. Div. 1950); Binder v. Green, 8 N.J. Super. 88, 93 (App. Div. 1950); Earle v. Winne, 34 N.J. Super. 605, 610 (Cty. Ct. 1955). In the present case, the introduction of new issues and the allowance of various amendments to the pleadings and pretrial order at a very late date in an already extended trial was improper and visited manifest injustice upon defendants Capasso. No fair opportunity was afforded them to prepare a defense to the new charges, through discovery proceedings, their own investigation, and other means.

*556 VII.
On September 11, 1958, the twelfth day of the trial, the recently substituted counsel for the borough and its officials applied for permission to change the position theretofore taken by them, as set forth in their original answer and amended answer and as repeated on a number of occasions during the preceding trial days. Up to that moment the borough and its officials had insisted that the ordinance and the contract were valid. These defendants were now allowed to file a second amended answer alleging fraud and the invalidity of the contract, and a cross-claim seeking recovery against the Capassos of all moneys paid them under the contract. This change of position was permitted over the vigorous and extended objection of the Capassos' attorney. Counsel's request for adequate time to protect the interests of his client by investigation and discovery proceedings was promptly denied.
The Capassos insist that this sudden shift came as a shock and a surprise and amounted to a substantial deprivation of their fundamental rights. They quote from Grobart v. Society for Establishing Useful Manufactures, 2 N.J. 136, 149 (1949), where former Chief Justice Vanderbilt said:
"* * * It is not a mere matter of formal logic that leads the courts to insist that litigants shall not shift their position in successive pleadings. * * * [S]hifting causes of action in successive pleading will completely block the purpose of all pleading, i.e., getting to an issue or issues where one party asserts the affirmative and the other the negative on a question or questions of law or of fact."
It seems inappropriate to extend the Grobart rule to the present case. When the original answer was filed by the borough and borough officials  and so with the amended answer to plaintiff's amended complaint  the officials apparently had the honest belief that the Capasso contract was in all respects valid. What came out in the course of the trial, mostly through witnesses and exhibits brought into *557 the case by the court and its amicus curiae, must have changed their minds. It is also possible that they had a second thought in the light of the impact of the grand jury's action upon the public and the newspapers, and the impending legislative investigation into the scavenger business.
If the Capasso contract was not in fact the result of bona fide competitive bidding, it was important and proper from the point of view of the paramount public right and interest to allow the amended answer. However, fairness to defendants dictated that they be allowed a reasonable time for discovery and investigation, in order that the facts in support of their claim that the contract was valid might be developed and presented. They had up to that moment been dealing with a situation where the borough and its officials had stoutly affirmed the validity of the contract. The municipality had taken no steps to rescind the agreement, but had accepted scavenger service and made monthly payments thereunder even during the period of the hearings. Its position had been affirmed and reaffirmed, in its pleadings, in the pretrial order, and during the trial. Fundamental fairness required that the court allow the Capassos sufficient time to meet the radically new situation facing them. The denial of that opportunity was the denial of due process.

VIII.
The Capasso brief claims error under 12 heads in the admission of certain testimony and exhibits. We have carefully considered them and find merit in several of the contentions made. However, except for a single item, we shall not discuss the evidence questions raised. Since there must be a full retrial of the matter, some of the evidence may become pertinent when there has been a proper arrangement of the parties on either side of the case and a precise formulation of the issues.
The one matter which merits discussion at this time involves two statements given by Health Officer Begyn to the prosecutor's office. They were made under oath, but not *558 signed. In those statements Begyn said he had received payments from Mastrangelo, who had held the scavenger contract before the Capassos, and that after the Capassos had been awarded the current contract they had paid him $250 a month. Defendant Frank Capasso had also loaned him $2,000.
When plaintiff called Begyn as its witness he refused to answer most of the questions put to him on a claim of privilege against self-incrimination. The trial judge sustained his refusal on that ground, but after the witness had left the stand he announced that Begyn was "unavailable" as a witness and that he was prepared to admit the statements given the prosecutor. The judge then called the two assistant prosecutors and two shorthand reporters, who identified Begyn's unsigned statements as having been taken in the prosecutor's office in the course of a criminal investigation. Defendants, of course, had not been present when the statements were made.
The court requested counsel for plaintiff and the borough to offer the statements as exhibits. They refused, informing the judge that he was about to fall into error. A similar request was addressed by the court to amicus curiae, who expressed considerable doubt as to the admissibility of the statements but nonetheless offered to put them in evidence. Counsel for the Capassos made an extended objection, but the statements were marked in evidence as the court's exhibits and eventually fully utilized in its conclusions.
Counsel for the Capassos contends that the statements were hearsay, and should have been excluded. The trial court supported their admissibility by referring to the proposed rules contained in the Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey (1955), Rules 63(4)(c) and 63(10), respectively taken from Rules 503 and 509 of the American Law Institute's Model Code of Evidence.
Rule 63(4)(c) of the Supreme Court Committee's Report provides that "if the declarant is unavailable as a witness, *559 a statement narrating, describing or explaining an event or condition which the judge finds was made by the declarant at a time when the matter had been recently perceived by him and while his recollection was clear, and was made in good faith prior to the commencement of the action," is admissible. The Committee Annotation admits that no New Jersey decisions had been found supporting the rule as proposed, the only authority indicating approval and possible acceptability being found in the concurring opinion of former Chief Justice Vanderbilt in Robertson v. Hackensack Trust Co., 1 N.J. 304, 315 et seq., 320 (1949), and an earlier opinion by Advisory Master Van Winkle, In re Petagno, 24 N.J. Misc. 279, 48 A.2d 909 (Ch. 1946). The Drafters' Comment notes that
"* * * Unavailability is here recognized as an essential justifying factor. Also the trial judge is necessarily given considerable discretion. Clause (c) is drafted so as to indicate an attitude of reluctance and require most careful scrutiny in admitting hearsay statements under its provisions. The fact remains that there is a vital need for a provision such as this to prevent miscarriage of justice resulting from the arbitrary exclusion of evidence which is worthy of consideration, when it is the best evidence available. * * *"
The Supreme Court Committee defined "unavailable as a witness," as used in Rule 63, to include "situations where the witness is (a) exempted on the ground of privilege from testifying concerning the matter to which his statement is relevant, * * *." Rule 62(7).
Rule 63(10) recommended by the Supreme Court Committee excepts from the hearsay rule (subject to the limitations of sub-paragraph (6) relating to confessions):
"* * * a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected him to civil or criminal liability * * * or created such risk of making him an object of hatred, ridicule or social disapproval in the community that a reasonable man in his position would not have made the statement unless he believed it to be true. * * *"
*560 The Committee Annotation observes that the New Jersey decisions tend to support the common law requirements that the declarant be dead, that only a declaration against pecuniary or a proprietary interest is "against interest" within the purview of the exception, and that it was against interest at the time it was made. Turner v. Cole, 116 N.J. Eq. 368 (Ch. 1934), affirmed 118 N.J. Eq. 497 (E. & A. 1935).
We recognize that in the Report of the Commission to Study the Improvement of the Law of Evidence (1956), presented to the Legislature under Joint Resolution 15 (1955), the Commission in its proposed Rule 62(7) deleted from the definition of "unavailable as a witness" anyone exempted from testifying on the ground of privilege. It also eliminated subsection (c) from the Supreme Court Committee's proposed Rule 63(4). The Commission recommended changes in its proposed draft of Rule 63(10) which would make the Begyn statements inadmissible.
The rules proposed by the Supreme Court Committee, as well as those recommended by the Legislative Commission, have not been adopted and therefore do not represent existing law. Ruth v. Fenchel, 21 N.J. 171, 175-176 (1956), affirming 37 N.J. Super. 295 (App. Div. 1955). We are left to deal with the question as a matter of first impression.
We have concluded that the action of the trial judge in admitting the Begyn statements was correct. The witness had claimed his privilege against self-incrimination, and his right to do so was recognized. He thereby made himself as unavailable as if he were dead, mentally incompetent, or absent beyond the jurisdiction of the court to compel his appearance by process. The statements he gave the assistant prosecutors under oath bear every indicia of trustworthiness, as is clearly apparent from a reading thereof. He was obviously telling just what his relations were with Mastrangelo, and later the Capassos. Initially hesitant to tell the prosecutor's office the whole story, he then proceeded *561 to give it in detail. His admissions deeply involved not only his official position but himself personally, since he opened himself to criminal prosecution.
We consider Begyn to have been an unavailable witness. The statements he so fully gave the prosecutor were clearly against interest. The truth is better served when statements like Begyn's are admitted in evidence to aid in determining whether the public interests have suffered. See McCormick on Evidence, § 257, p. 554 (1954); Sutter v. Easterly, 354 Mo. 282, 189 S.W.2d 284, 162 A.L.R. 437 (Sup. Ct. 1945).

IX.
There is no point in discussing whether the trial judge correctly determined the issues not found in the pretrial order but created by him or at his instance. Nor need we discuss whether, as the Capassos insist, there is no basis in law or in fact to sustain the crossclaim filed by the borough. A new trial makes any such discussion academic.

X.
The judgment is reversed and the matter remanded for a full trial to determine the validity of the scavenger contract. Substituted pleadings should be filed, reasonable discovery allowed and a new pretrial conference held, in order that the exact position of the several parties will be manifest, their respective contentions clearly defined, and the issues sharply drawn. In view of the fact that the borough, mayor and council, and borough manager now challenge the validity of the Capasso contract, there would appear to be no need for the services of an amicus curiae. The parties can be relied upon to develop fully what are patently the issues of the case, including such questions as compliance with the bidding, appropriation and prequalification statutes, and the charges of collusion and connivance among the bidders and between the Capassos and the borough officials. Costs to abide the result of the new trial.