## MOORE v. SYKES' ESTATE.

(Division B. Oct. 2, 1933. Suggestion of Error Overruled Oct. 30, 1933.)

[149 So. 789. No. 30692.]

**Paine & Paine,** of Aberdeen, for appellant.

McFarland & Holmes, of Aberdeen, for appellee.

Argued orally by **Geo. C. Paine**, for appellant.

**Griffith, J.**, delivered the opinion of the court.

Appellant owned and operated a negro boarding house in the city of Aberdeen. Homer Sykes, according to all testimony, boarded at said house. He was not related to appellant either by affinity or consanguinity; he had no children. And he had no near relatives living in that community. About the year 1922 his wife, who for two years theretofore had lived with him in a house owned by him in said city, had left him and had gone North, where she has since that time resided. Soon after her departure, Sykes went to appellant's boarding house, and there remained and boarded until his death in 1930. Appellant petitioned the chancery court for a decree allowing her five hundred forty dollars for three years' board claimed to be due her by Sykes at fifteen dollars per month, and for a sale of the house and lot owned by Sykes at his death. Katie Sykes, the absent widow of the decedent, resisted the petition, and on the hearing the chancellor denied the relief and dismissed the petition.

It appears from the chancellor's opinion that he correctly adhered to the rule that, where a person not related or a member of the family comes to another person to board, there is the presumption of an agreement or understanding that board will be paid, if the person so boarded is able to pay. Tarver v. Lindsey, 161 Miss. 379, 384, 137 So. 93. The chancellor referred, however, to the further presumption mentioned in that case, that, if the person boarded be shown to have been from time to time able to pay, then without countervailing proof the presumption of payment made will stand; and the chancellor held that the countervailing proof in this case was not sufficient to overturn that presumption. Appellant in her brief and argument points out and strongly presents the view that there is no dispute of the countervailing proof offered by the petitioner here, and that this proof was of the same nature and strength as that which in the Tarver v. Lindsey case, and also in Loviza v. Lynch, 115 Miss. 694, 76 So. 629, was held to be sufficient to overturn

the stated presumption; and in that contention we think appellant has much the best of the argument.

But we are not satisfied to reverse and render decree here as was done in the case first cited, and certainly we cannot be content to affirm—this because of the unsatisfactory condition of the present record, its failure in the full development of the facts, its lack of definiteness in many of its important and perhaps controlling features. We are put in inevitable doubt as to what inferences the chancellor may have been able to legitimately draw from the imperfectly developed evidence, and the want of evidence, which could have been easily supplied by way of direct testimony, rather than leave salient features suspended in mid-air to be reached by inference, or supplied by conjecture.

We may mention some of these important omitted features without which we cannot safely proceed, nor could the chancellor. But we cannot refer to all of them within the proper limits of a written opinion. First, we may notice that three or four witnesses were asked what in their opinion was a reasonable sum to be allowed for the board of this man, and the answers varied from eight to twenty dollars per month. If the chancellor had been able to find that eight dollars was a proper amount, we might feel justified in affirming this decree when the several other facts were applied. If, however, he had found twenty dollars to be a correct amount, then the opposite result would follow. If fifteen dollars per month were found to be the proper amount, the case would be closer by far. Our point here is this: It is common knowledge that, ordinarily, boarding houses have regular and established rates, and the reasonable presumption is that a boarder at a boarding house which has for some time been in existence has agreed to pay the regular and established rate, but there is not in this record a word of what would be the best proof on this issue; namely, what the rates were at this house.

In the next place we may mention that it was shown

by two or three witnesses that appellant, in addition to her boarding house, kept some kind of a store, and it was said by them that Sykes assisted in this store by sometimes waiting on customers, particularly in handing out soft drinks, and also that he kept the books for appellant for this store. It is argued from this that thereby Sykes paid his board or a part of the amount thereof. But there is nothing in this record as to the size of this store, whether it was a mere road or street side soft drink establishment containing only a handful of articles, and the books of which, if any, were of no consequence, or whether it was an establishment of considerable size, necessitating a set of books of importance. And how could the chancellor with no more information than was given him on that subject intelligently weigh that issue, and how can we tell what and how much of weight he gave to that store and bookkeeping matter? And yet its materiality in this case is obvious.

Again, it is shown that Sykes was often ill and was generally complaining of being sick. There is no showing whether he had a physician at any time or times, and whether he was put to expenses on account thereof, and how much; and whether he bought drugs and how much they cost. It was attempted in the most general and undependable way to show that he did some carpenter's work but for whom, and how much he received, the record is silent; against which there is other evidence that he did no such work at all, and that he was not physically able to do such work. There is evidence also that he was a member of an orchestra or band and sometimes played for entertainments, and, although members of that organization were available and one of them testified, no definite evidence was produced as to how often these engagements were filled or as to what was received therefor and when or whether actually paid. The only definite evidence of any earnings by Sykes was that for four months each year he worked for a hardware concern at eleven dollars per week, which would give him

about forty-five dollars per month or for four months one hundred eighty dollars, which, if he had any other expense at all, would not pay his board for a year at fifteen dollars per month.

Without further pursuing the various features in the matter of the claim for board, although there are several other such features, we may add that the evidence in respect to the homestead exemption claimed by the absent widow is incomplete in several material respects. One of the requirements of the statute, section 1765, Code 1930, allowing the homestead exemption, is that the exemptionist, if under the age of sixty years, must be a householder; and the term "householder" means a person who has a family whom he keeps together and provides for and of which he is the head and master. New Orleans & G. N. R. Co. v. Walden, 160 Miss. 102, 133 So. 241. The evidence shows only that Sykes, throughout the seven or eight years of his wife's continued absence, kept the house in which he had formerly lived with his wife in a clean and habitable condition, that he went there every week and sometimes more than one day each week, and that he occasionally slept there, although the evidence is in conflict on the matter last mentioned. But the evidence is silent whether he expected, and had good reason to expect, that his wife would or probably might some time in the reasonably near future return, so that it might be held that the home, although then broken of a family, was being held open for a reuniting at some future time reasonably to be anticipated. One witness did say that he had seen her in a distant city and that she said she did not expect to return, but her reason, if any, is not developed. The husband may have driven the wife away or made it impossible, by other offenses against her, for her to live there, yet there may have remained in good faith an expectation or willingness on her part to return when the justifiable causes for her departure should be removed—these are some of the matters that ought to be developed for the consideration of

the court in passing on the claim of exemption made by this widow now absent, and absent without any explanation thereof in this record, for all the years that have passed since 1922.

Since courts are organized and exist for the correct administration of justice upon the facts of each case, and since obviously exact justice can be administered only when the exact facts are made known to the court, or at least to the extent reasonably possible in each case, it follows that a court, such as the chancery court, should not attempt to decree on the merits unless and until the facts are presented in a definite manner so far as reasonably possible, and that the court should not be called on to act finally upon a state of facts so inadequately developed in material details that the appellate court upon a review of the record cannot tell where inference has ended and conjecture may have begun.

Ever since our chancery court system has been in operation in this state, going back to the earlier days of our judicial history, it has been an established and well-recognized part of that system that one of the important obligations of the chancellor is to see that causes are fully and definitely developed on the facts, and that so far as practicable every issue on the merits shall be covered in testimony, if available, rather than that results may be labored out by inferences, or decisions reached for want of testimony when the testimony at hand discloses that other and pertinent testimony can be had, and which when had will furnish a firmer path upon which to travel towards the justice of the case in hand. This power and obligation reaches back into the ancient days of chancery when the chancellor called the parties before him and conducted a thorough and searching examination of the parties and the available witnesses and decreed accordingly. And, while now this duty of calling the witnesses and the conduct of their examination is placed in the first instance and generally throughout on counsel, the power and duty of the chancellor in that respect is not

thereby abrogated; and while to be exercised only in cases in which it is fairly clear that the duty of the chancellor to intervene has arrived and is present, when that situation does arise and is perceived to be present, the duty must be exercised and is as obligatory as any other responsible duty which the constitution of the court imposes on the chancellor.

More than a half century ago our supreme court in Beard v. Green, 51 Miss. 859, expressly pronounced upon the obligation and responsibility mentioned, and in that case said: ''The power of the chancery court to remand a cause for further proof at any time before final decree, and in some cases after it, either with or without the consent of parties, is one of the marked characteristics distinguishing it from a court of law, and is one of its most salutary and beneficent powers. It should always be exercised where it is necessary to the ascertainment of the true merits of the controversy.'' And the court went on to say that it was immaterial as to how the necessity of the action by the court arose, whether through inattention or misapprehension or misconception by counsel or litigants, and that none of these or the like should be allowed to prevent the doing of justice. And the duty of the chancellor in this respect was again declared in a late case, McAllister v. Richardson, 103 Miss. 433, 60 So. 570, 572, wherein it was pointed out that the duty, and this of course carries the power, is not only to remand to rules, but includes the obligation on the part of the chancellor during the hearing to see ''that all proper testimony was introduced to enable him to render a decision giving exact justice between the contending parties''—to conduct the hearing in such manner ''that all testimony which will throw light upon the matters in controversy is introduced,'' and that he is within his privileges and duties in aiding to bring out further competent and relevant evidence during the examination of the witnesses who are produced.

Such being the power and duty of the chancellor, it

has long been the practice in this court that, when the record does not disclose important and material pertinent facts, and which at the same time are revealed by the record as being available, and which therefore should have been produced, the decree will be reversed and the cause remanded in order that the additional definite facts may be placed in proof on a new trial and so that the chancellor, and this court on review, may have that which is the more dependable towards the essential end of reaching a correct and just result. This course is not often taken in this court, it is true, but, when necessary or plainly conducive to a dependable result, it is nevertheless done. Two of the recent cases of this kind which we happen to have before us are Kirby v. Gay, 136 Miss. 781, 101 So. 705, and Stoner & Co. v. Blocton Export Coal Co., 135 Miss. 390, 100 So. 5, and there are a number of others. This record falls within the requirements of the stated rule, and the cause is therefore remanded for a new trial, and for a full and complete development of the facts of the case.

Reversed and remanded.