JONES, Justice.
This is a will contest coming from the Chancery Court of Forrest County, Mississippi, which court revoked the previous probate in common form and held the will void. For the reasons hereinafter stated, the case is reversed and remanded for a more complete hearing on the facts.
Mr. J. W. Prine, Sr., had been married twice. By his first wife he had nine children, and by the second wife, one. He died in September, 1966, at a time when the child of his second marriage was only six years of age. The children of his first marriage were all adults and either married or presumably had sufficient means of support. On or about August 26, 1966, Mr. Prine, a man of sixty-seven or sixty-eight years of age, made a will by which he devised all of his property to the young son and named one of his daughters, Mrs. Aliece Prine Utley, as executrix of the will.
The will was admitted to probate in common form about four days after the death of the testator. The decree admitting the will to probate was dated September 28, 1966. Mrs. Utley was appointed as executrix and qualified on the same day. She thereupon proceeded to administer the estate. On November 11, 1966, a decree was entered on the petition of the executrix authorizing her to lease the sawmill property belonging to the estate to two of the adult sons of the testator, J. W. Prine, Jr. and Clinton Ray Prine. This decree fixed the terms for the lease. The record is not clear as to whether the son operated such sawmill business or leased it; but five months later, eight of the adult children of the testator by his first marriage filed their petition in the Chancery Court of Forrest County against the minor son, James D. (Danny) Prine and Mrs. Aliece Utley, individually, seeking to have the probate of the will revoked. This petition for revocation was based on the grounds that the testator at the time of the execution of the will was not of sound mind and memory but was mentally incapacitated and that he was coerced into executing the will by the undue influence of the defendant, Mrs. Utley.
On March 20, 1967, Mrs. Utley filed her answer denying the allegations of the petition as to the incompetency of the testator and denying that he had been coerced into signing the will by any undue influence exerted by her. She denied that the *189 writing was not in fact and in truth the will of J. W. Prine, Sr. Honorable John M. Dunnam, Jr., an attorney at law of New Augusta, Mississippi, was appointed guardian ad litem of the said minor and adopted as the answer of the minor, the answer filed by Mrs. Utley. It is interesting to note that among those joining in the petition to revoke the probate of the will were the two sons, J. W. Prine, Jr. and Clinton Ray Prine, to whom the executrix had in November, 1966, obtained an order to lease the property, and Mrs. Annie Lee Prine, who was an attesting witness to the will and upon whose ex parte affidavit the will was admitted to probate.
Upon the trial, no testimony as to the mental capacity of the testator was introduced except that of laymen and two of the daughters-in-law of the testator, one of which was a witness to the execution of the will.
In June, 1966, the testator had secured a divorce from his second wife, to whom he had been married for about thirteen years, and the Chancery Court of Forrest County awarded to him the care and custody of the minor child. It was asserted by these lay witnesses that his mind began to go bad during that month. They did not dispute the fact, however, that the chancellor had seen and heard the testator in the divorce hearing, and had not only granted him the divorce, but also the custody of the child. It is further undisputed that the testator had made statements to the effect that he wanted this small child taken care of and to have an education. One of those testifying in an effort to destroy the will so stated. The witnesses gave evasive answers when asked whether or not the act of a father of ten children, nine of whom were adult and independent and one of whom was but six years old, in leaving his small estate to provide for the six-year-old son was a natural and expected act in conformity with the human inclinations and actions. It appears to us that such a disposition could be only the natural act of a sane man and father.
The testator was carried to the hospital three or four days before the day of the execution of the will on August 26, 1966. He left the hospital either that night or the next morning. None of the lay witnesses, except the attesting witness and her sister-in-law, saw him on August 26 — to say nothing of the time when he executed the will. Several of the witnesses testified that the testator did have lucid intervals.
One of the witnesses said he saw the testator a week or two before the testator entered the hospital and two or three days after the testator was discharged. Notwithstanding the fact that this witness did not see the testator on August 26, he was asked this question:
Now * * * based on your association with Mr. Prine, Mr. J. W. Prine, Sr., and based on your attempted conversations with him and he with you, and your observation of him, tell the court, in your opinion, whether or not on the twenty-sixth day August, nineteen and sixty six, he was mentally capable of understanding the execution of a will ?
To this question an objection was made on grounds that it was not established that the witness saw the testator on that day. The objection was overruled, and the answer was “[H]e was not.” The answer of the other lay witnesses to this question was that the testator was not competent on August 26. This question can be classed only as a hypothetical question.
The testator was then carried to Mobile, Alabama. This same witness, who had answered the hypothetical question by saying that the testator was not competent on the date of the will although he had not seen the testator, said on further examination he knew nothing of the condition of the testator’s mind after the testator was carried to Mobile. He admitted that he *190 did not see the testator after that time. The following examination occurred:
Q. So far as you know his mind could have been all right ?
A. After that.
Q. Yes, sir.
A. I couldn’t say about that after he left from home to go to Mobile. I couldn’t say what kind of state his mind was in, no, sir.
Q. You wouldn’t say it was good or bad?
A. No, sir, I wouldn’t say if I didn’t see him, (Emphasis added.)
This hypothetical question was asked of other laymen whose answers were to the same effect. These witnesses also admitted during their examinations that they could not tell anything about his mental state at a time when they did not see him. Of course, a layman could not reasonably know the condition of testator’s mind when he did not see the testator. The question propounded was a question for the experts. Certainly it would take an expert to tell from the appearances and actions of a man, observed prior to his entry in the hospital and after his discharge from the hospital, whether the man was competent or incompetent on a certain date between entry and discharge. Several of the witnesses said that the testator had lucid intervals. One who was not there could not know, and would not be in a position to know, whether a man who had lucid intervals was lucid or not at a particular time.
An opinion or inference of a technical nature should not be asked of, or given by, a non-expert witness. 32 C.J.S. Evidence § 546(29) (1964).
As a general rule, the opinion of a non-expert witness as to a person’s sanity or soundness of mind, if based on knowledge or observation, may be received; but the opinion may not extend to matters requiring expert knowledge. Id. § 546(32). Certainly it would require someone knowledgeable, trained, and experienced in the field of sanity and mental conditions to be able to answer the question asked the witnesses. Furthermore, the question was not confined to the time of the execution of the will.
A non-expert witness cannot give his opinion regarding sanity based on an abstract hypothetical question. Id. § 547.
An opinion of a lay witness on the question of another’s insanity must be limited to the impression made at the time of observation. Ross v. State, 153 Tex.Cr.R. 312, 220 S.W.2d 137 (1949); State v. Douglas, 312 Mo. 373, 278 S.W. 1016 (1925); 23 C.J.S. Criminal Law § 867 at 422 (1961).
Non-expert witnesses cannot be allowed to project the opinion as to the mental condition of accused at a future time. Ross v. State, supra; 23 C.J.S. supra; see also Harvey v. State, Miss., 207 So.2d 108 (Feb. 19, 1968).
The next two witnesses who testified saw the testator at times nearer to the time of the execution of the will than any of the other witnesses. Mrs. Doris Prine, a daughter-in-law of the testator, testified she did not see the testator at the time of the execution of the will. She was not present. The time of her observation of him nearest to that of the execution of the will was on that date that he was brought home from the hospital. Of course she could not testify as to his condition at the time of the execution of the will. She did testify strongly as to other circumstances; but her testimpny may be affected somewhat by the facts that she was a daughter-in-law of the testator and that her husband was one of those contesting the will and seeking part of the estate.
The next witness is in one of the most unusual situations it has been this writer’s privilege to observe. She is Mrs. Annie Lee Prine. She is a daughter-in-law of *191 the testator, and her husband is one of the contestants who would profit by destroying the will. She was also an attesting witness to the will. A few days after the death of the testator, she signed an affidavit in the usual form for such witnesses for the purpose of admitting the will to probate in common form. Her affidavit contained the following statement:
[A]nd that the said J. W. Prine, Sr. signed, published and declared the said instrument as his Last Will and Testament on the 26th day of August, A. D., 1966, the day of the date of said instrument in the presence of Mrs. Annie Lee Prine and Mrs. Maggie Byrd, the subscribing witnesses to said instrument; that said testator was then of sound and deposing [sic] mind and memory and understanding, over the age of twenty-one years, and that the said affiant subscribed and attested said instrument as witness to the signature and publication thereof, at the special instance and request and in the presence of said testator and in the presence of each other.
This affidavit was executed just one day over a month after the said witness had subscribed her name to the will as an attesting witness, and the will was admitted to probate on her affidavit. Because her affidavit had been introduced in the trial of this cause with the papers showing the probate of the will in common form, the court permitted the contestants to call this witness as an adverse witness and cross-examine her. The evidence shows that she was not adverse in her attitude but was very much prejudiced and biased in favor of the contestants. She admitted signing the affidavit quoted above; and, as an excuse for signing it, she stated, “I did that for peace of mind to Mr. Prine and to have his bills paid.” At the time she signed the affidavit, Mr. Prine was already dead. When this was called to her attention she said she thought the examining attorney meant in August. Of course a will is not necessary for decedent’s debts to be paid from his estate.
This is the only witness testifying who was present at the execution of the will. Her testimony is impeached by her own affidavit as well as by her prejudice— obvious even in this cold record of testimony now before us.
Mrs. Maggie Byrd, a sister of the decedent, also was present at the execution of the will and witnessed it; but she was not introduced, nor is there any attempt to secure her presence evidenced by the record. It was stated that, at the time of the trial, Mrs. Byrd was in Alabama at the bedside of a sick daughter. It is shown there were in the room at the time of the signing of the will, in addition to attesting witnesses, Mrs. Aliece Prine Utley, Tom Camp, and a patient in the bed next to Mr. Prine.
There was no effort by the court, the guardian ad litem, or anyone else to have these witnesses or Mrs. Byrd present or to have their depositions taken. Mrs. Ut-ley was a defendant, and the contestant said that she was the one who unduly influenced the testator to make the will. According to her answer all these allegations are denied, and she asserts the validity of the will.
If she were testifying in accordance with her answer and to uphold the will, she would not be testifying to establish any claim against the estate or to establish a defense of her own. If the will is upheld, she acquires no interest thereunder. Her testimony would operate to defeat any potential interest or claim she might have against the estate.
We do not know what the other witnesses would say, of course, but they should have been before the court either in person or by deposition at least. No nurse from the hospital was called. There was no attempt to introduce any evidence of any physician as to the mental condition of the testator
*192 Of course there was a presumption of the testator’s sanity at the time of the execution of the will, which, under the existing circumstances, contained a natural and to be expected disposition of a small estate. The probate of the will in common form made a prima facie case. The burden was on the contestants to prove incompetency.
It was the duty of the. court, as well as the guardian ad litem, to protect the interests of this minor because he was unable to do so or to waive anything. There was a dearth of testimony as to the actual execution of the will. Only one witness present at the execution of the will testified, but the record shows there were at least four others whose testimony might have been received, not counting the hospital personnel.
In this case the difficulty might be said to have arisen from the fact that the court-appointed guardian ad litem for the minor was not a resident of the city or county where the cause of action accrued. Thorough investigation by him would require more effort and time than would be required of a resident. However, a guardian ad litem is not required to accept such an appointment. The function of such an appointment is to fill an office of responsibility and trust to both the infant and the court. The guardian ad litem is obligated to investigate diligently the facts and to protect the interest of the infant in the same manner that the infant ought to do and could do if he were an adult. It is his duty to protect the interest of the infant at every step of the whole proceedings. He has the same obligation of diligence as fiduciaries generally. He can make no admission to the injury of the minor, and every allegation which affects the infant must be duly proven. Griffith, Mississippi Chancery Practice §§ 532-33 (2d ed. 1950). In section 533 of Griffith, it is stated:
The court, which is the guardian of all minors, should, regardless of the delinquency of its officer, reject of its own motion all incompetent evidence introduced which will adversely affect the estate of the minor.
The testimony by the law witnesses expressing their opinion, based on their observations on other occasions, that the testator did not have testamentary capacity on the date of the execution of the will must be held as incompetent. This testimony was an attempt to corroborate and give support to the testimony of the only witness testifying who was present at the execution. The other witnesses present at the execution of the will were equally available to the contestants, but the contestants made no effort, according to this record, to procure their attendance.
The duty of the chancery court in this regard is clearly and succinctly stated in Moore v. Sykes’ Estate, 167 Miss. 212, 219-221, 149 So. 789, 791 (1933):
Ever since our chancery court system has been in operation in this state, going back to the earlier days of our judicial history, it has been an established and well-recognized part of that system that one of the important obligations of the chancellor is to see that causes are fully and definitely developed on the facts, and that so far as practicable every issue on the merits shall be covered in testimony, if available, rather than that results may be labored out by inferences, or decisions reached for want of testimony when the testimony at hand discloses that other and pertinent testimony can be had, and which when had will furnish a firmer path upon which to travel towards the justice of the case in hand. This power and obligation reaches back into the ancient days of chancery when the chancellor called the parties before him and conducted a thorough and searching examination of the parties and the available witnesses and decreed accordingly. And, while now this duty of calling the witnesses and the conduct of their examination is placed in the *193 first instance and generally throughout on counsel, the power and duty of the chancellor in that respect is not thereby abrogated; and while to be exercised only in cases in which it is fairly clear that the duty of the chancellor to intervene has arrived and is present, when that situation does arise and is perceived to be present, the duty must be exercised and is as obligatory as any other responsible duty which the constitution of the court imposes on the chancellor.
More than a half century ago our Supreme Court in Beard v. Green, 51 Miss. [856] 859, expressly pronounced upon the obligation and responsibility mentioned, and in that case said: “The power of the chancery court to remand a cause for further proof at any time before final decree, and in some cases after it, either with or without the consent of parties, is one of the marked characteristics distinguishing it from a court of law, and is one of its most salutary and beneficent powers. It should always be exercised where it is necessary to the ascertainment of the true merits of the controversy.” And the court went on to say that it was immaterial as to how the necessity of the action by the court arose, whether through inattention or misapprehension or misconception by counsel or litigants, and that none of these or the like should be allowed to prevent the doing of justice. And the duty of the chancellor in this respect was again declared in a late case, McAllister v. Richardson, 103 Miss. [418] 433, 60 So. 570, 572, wherein it was pointed out that the duty, and this of course carries the power, is not only to remand to rules, but includes the obligation on the part of the chancellor during the hearing to see “that all proper testimony was introduced to enable him to render a decision giving exact justice between the contending parties” — to conduct the hearing in such manner “that all testimony which will throw light upon the matters in controversy is introduced,” and that be is within his privileges and duties in aiding to bring out further competent and relevant evidence during the examination of the witnesses who are produced.
Such being the power and duty of the chancellor, it has long been the practice in this court that, when the record does not disclose important and material pertinent facts, and which at the same time are revealed by the record as being available, and which therefore should have been produced, the decree will be reversed and the cause remanded in order and the additional definite facts may be placed in proof on a new trial and so that the chancellor, and this court on review, may have that which is the more dependable towards the essential end of reaching a correct and just result. This course is not often taken in this court, it is true, but, when necessary or plainly conducive to a dependable result, it is nevertheless done. Two of the recent cases of.this kind which we happen to have before us are Kirby v. Gay, 136 Miss. 781, 101 So. 705, and Stoner & Co. v. Blocton Export Coal Co., 135 Miss. 390, 100 So. 5, and there are a number of others. This record falls within the requirements of the stated rule, and the cause is therefore remanded for a new trial, and for a full and complete development of the facts of the case.
We can add nothing to what is said by our Court, in that case, except that the above rule should certainly apply where a minor’s interests are involved. This case was not fully and definitely developed on the facts. The record discloses that there are important, material, and pertinent facts and available witnesses which should have been produced.
For these reasons we are reversing and remanding this case for a new trial on the merits.
Reversed and remanded.
GILLESPIE, P. J., and RODGERS, BRADY and INZER, JJ., concur.